M.J.C.A., menor de edad, aquí representado por su custodio y abuela materna, FRANCISCA V. de A., y ésta por sí, demandantes y recurridos, *v.* JULIO E. y su esposa CARMEN E. M., cada uno de ellos por sí y ambos en representación del menor J.L.E.M., también conocido como J.L.E.A., demandados y recurrentes.

*Número:* RE-86-28 *Resuelto:* 12 de diciembre de 1989

912

*Carmen Rita Vélez Borrás*, abogada de los recurrentes; *Sarah Torres Peralta*, abogada de los recurridos.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

I

¿Pueden los abuelos paternos adoptar a su nieto, *huérfano de padre y de madre*, aun cuando fueron nombrados

tutores testamentarios, no rindieron las cuentas de la tutela y la abuela materna no fue oída en el procedimiento donde tanto ella como el hermano materno del menor se oponen a la adopción? Esta es la cuestión planteada ante nos.

██ A los fines de ubicar en adecuada perspectiva dicha cuestión, examinemos los perfiles históricos de la adopción, su naturaleza y los propósitos en nuestra legislación, y sus requisitos sustantivos y procesales. Al hacerlo, reconocemos que existe un claro interés público en asuntos tan, delicados como lo son los requisitos sustantivos y procesales de la adopción. Éstos requieren que entremos a examinar algunos aspectos medulares del caso de autos.(1) Además, el drama conflictivo que figura en autos nos obliga a pronunciarnos con firmeza en contra de la bifurcación injustificada de pleitos encaminados a determinar la custodia o el *status* de un menor huérfano. Las motivaciones y los intereses de cada parte en litigio no siempre concuerdan con los mejores intereses emocionales, físicos, económicos y psicológicos del menor. Éstos deben ser siempre la principal motivación y el derrotero en la solución de este tipo de controversia.

---

(1) La adopción ha venido a llenar las aspiraciones de muchas parejas que no pueden procrear hijos. El incremento en el número de adopciones completadas y solicitudes presentadas a las agencias públicas y privadas dedicadas a la colocación de niños en nuestra vida es patente. Durante el año fiscal 1984–1985 solamente se recibieron en el Departamento de Servicios Sociales 1,239 solicitudes de adopción. De esas, 596 fueron aprobadas. Durante 1984 se completaron 374 adopciones, la mayoría de niños de 3 años o menos. Durante el año fiscal 1986–1987 se recibieron 674 solicitudes, de las cuales 512 fueron aprobadas y se completaron 364 adopciones. Para el año fiscal 1987–1988 se recibieron 678 solicitudes de las que se aprobaron 518. Se completaron 294 adopciones. Informes de Adopción, SP 412, División de Estadísticas del Departamento de Servicios Sociales. En Estados Unidos, en 1986, se efectuaron un total de 114,107 adopciones. *Adoption Fact Book*, National Committee for Adoption, 1986, pág. 60.

La adopción, al alterar el régimen familiar ordinario, resulta de gran interés para el Estado y para la sociedad en general.

## II

*El desarrollo histórico de la adopción*

Los perfiles históricos de la adopción datan de tiempos remotos.[2] Sus propósitos no siempre han sido los que hoy conocemos. *Ex parte Warren*, 92 D.P.R. 299, 302 (1965).

En el Derecho romano la adopción se utilizó como forma de ingresar a una familia para la continuidad de la estirpe y con fines económicos, sociales y políticos. Por ello, cuando se carecía de descendencia natural se adoptaba a un "extraño" con tales propósitos. Se creaba, artificialmente, una patria potestad que permitía el ingreso de ese "extraño" al grupo familiar con una posición jurídica equivalente a la de un hijo o descendiente natural. *Ex parte Ortiz y Lluveras*, 42 D.P.R. 350, 355 (1931); J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1985, T. IV, págs. 219–220; L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 3ra ed., Madrid, Ed. Tecnos, 1983, Vol. IV, pág. 376.

En el Derecho justiniano aparece la distinción entre la adopción plena y la menos plena. La adopción plena se daba cuando el adoptante era ascendiente consanguíneo del adoptado. Sus efectos eran todos los inherentes a la patria potestad. En la menos plena, el adoptado se conservaba dentro de su grupo familiar biológico y adquiría prácticamente sólo el derecho a suceder abintestato al adoptante.[3] El Derecho

---

(2) Antecesores de la adopción son el Levirado, el matrimonio Nigoya hindú y el Alumnato persa. J. Jara Miranda, *La Legitimación Adoptiva*, Chile, Ed. Jurídica, 1968, pág. 16. Fue recogida y regulada sustantivamente por los babilonios en el Código de Hammurabi, F. Peinado, *Código de Hammurabi*, 1982, págs. 112–11 y 233–237, y sistematizada procesalmente en el Derecho de los griegos. Jara Miranda, *op. cit.*, págs. 18–21. El Viejo Testamento, en el Pentateuco (especialmente en Deuteronomio), incluye las primeras leyes en pro de los "huérfanos y abandonados". W.H. Slingerland, *Child-Placing in Families*, Filadelfia, The Russell Sage Foundation, 1918, pág. 26.

(3) Aún conservan esa distinción y disparidad de efectos los códigos de Francia, Italia y Argentina.

medieval conservó esa distinción. Véanse: *Fuero Real y Las Partidas* (4, 16, 1); Díez-Picazo y Gullón, *op. cit.*

En la época de la codificación, la figura de la adopción perdió importancia. La recogió el Código Civil francés, según el modelo justiniano de la adopción menos plena. Siguieron el mismo modelo el Código Civil italiano de 1885, el suizo y el español. El Código Civil alemán, sin embargo, se apartó de ese modelo y estableció la equiparación del adoptado con el hijo natural. En Inglaterra se reglamentó la adopción en 1926 al aprobarse el *Adoption Act*. Ésta siguió el concepto de la adopción plena. Lo mismo ocurrió en la Unión Soviética. Véase *Feliciano Suárez, Ex parte*, 117 D.P.R. 402, 407 esc. 1 (1986). En Estados Unidos la adopción la regula cada estado mediante leyes especiales. Éstas varían de acuerdo con el trasfondo civilista o anglosajón existente en cada jurisdicción. *Ex parte J.A.A.*, 104 D.P.R. 551, 555 (1976).

El Código Civil español, por su parte, siguió los modelos latinos. Aunque recogió la institución de la adopción, la reguló con unos perfiles muy imprecisos.[4] La base 5ta de la "Ley de Bases de 1888" dispuso que el Código Civil la regulase y fijara las condiciones, *e.g.* edad, consentimiento, etc., y las prohibiciones que considerasen suficientes para evitar las consecuencias adversas del abuso de ese derecho sobre la institución de la familia. Además, sustituyó la intervención administrativa por la judicial en el trámite de la adopción. Añadió la inscripción del adoptado como hijo del adoptante en el Registro Demográfico y admitió que el trámite fuera impugnable por el adoptado menor o incapaz. Los artículos del Código Civil español que regulaban la adopción —Arts. 173 a 180— lo hacían sin una orientación clara y sin recono-

---

[4] Según García Goyena, su inclusión en el Proyecto de Código de 1851 se debió a que un vocal andaluz de la Comisión afirmó que en su región se daban algunos casos. García Goyena, *Concordancia, motivos y comentarios del Código Civil español*, Madrid, Sociedad Tipográfica, 1852, T. I, pág. 148.

cerle efectos importantes, salvo los de la patria potestad, sobre el adoptado. Puig Brutau, *op. cit.*, pág. 220.

Con la extensión del Código Civil español en 1889(5) llega la institución de la adopción a Puerto Rico. De ahí que en *Ex parte Warren,* supra, pág. 302, expresamos: "Prosapia romana tiene la institución de la adopción en Puerto Rico."

En esos primeros años de vigencia del Código Civil español en Puerto Rico, la naturaleza de la adopción era contractual, revestida de formas solemnes. Sus efectos eran los de proveer al adoptado los derechos de alimentos, apellido del adoptante y derechos sucesorios cuando así se pactaba. El adoptado no salía de su familia natural y de ordinario conservaba todos sus derechos en ella. Quedaba bajo la patria potestad y protección del adoptante. Véase *Reseña histórica de la adopción en Puerto Rico y justificaciones para los nuevos cambios que se proponen a la legislación vigente sobre esta materia,* Mimeografía de la División de Bienestar Público del Departamento de Salud de Puerto Rico de 23 de marzo de 1953, pág. 2.

Sin embargo, "[a]l adoptarse el Código Civil de 1902, una de las pocas materias en que no se siguió estrictamente el Código Civil [e]spañol fue la de adopción, especialmente en cuanto se refiere a los derechos hereditarios de los hijos adoptivos". *Valladares de Sabater v. Rivera Lazú,* 89 D.P.R. 254, 258 (1963). Para regular ese aspecto de la adopción y liberalizar la institución, se aprobaron los Arts. 132 y 133 del Código Civil, 31 L.P.R.A. secs. 533 y 534, copiados del Art. 214 del Código Civil de Louisiana. *Rivera Coll v. Tribunal Superior,* 103 D.P.R. 325, 328 (1975).

▮ En 1953 nuestra Asamblea Legislativa aprobó la Ley Núm. 85 de 15 de junio para enmendar los Arts. 612 y

---

(5) Con el cambio de soberanía permanecerían vigentes todas las leyes provinciales y municipales que no fueran incompatibles con el nuevo gobierno. El Código Civil quedó vigente. Orden Militar Núm. 1 de 18 de octubre de 1898.

613 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 2691 y 2692. Éstos regulaban el procedimiento de la adopción. Añadió, además, los Arts. 613A a 613F, 32 L.P.R.A. secs. 2693 a 2698. Esta ley "forma parte de una reforma que responde a un nuevo enfoque sobre la adopción y que se caracteriza principalmente por el abandono del concepto clásico de que se trata de un contrato privado y por *la fijación de una intervención activa del estado a través de agencias apropiadas para salvaguardar el interés de la familia y especialmente del adoptado*". (Énfasis suplido.) *Ex parte Warren*, supra, pág. 305. Se intentó transformar así el carácter de la adopción al de una institución esencialmente social. 2 Diario de Sesiones de la Asamblea Legislativa (Ordinaria), T. II, pág. 1291 (1953).

De ahí que, en *Rivera Coll v. Tribunal Superior*, supra, pág. 327, expresamos que "[a] partir del 15 de junio de 1953, con la aprobación de las leyes Núm. 85 y Núm. 86 de ese año, 32 L.P.R.A. secs. 2691 [y 2692 a] 2698 y 31 L.P.R.A. secs. 531–539, respectivamente, tanto el procedimiento para la adopción como la figura jurídica de la adopción son el producto de nuestra autoctonía".[6]

■ El historial legislativo de dichas leyes señala: "El propósito de la adopción . . . es proveer, *es dar padres a niños que no los tienen*, o cuyos padres no los quieren, o no los pueden atender debidamente." (Énfasis suplido.) Diario de Sesiones, *supra*, pág. 1292. Véase *Ex parte J.A.A.*, supra, pág. 557.

---

[6] El Código de Enjuiciamiento Civil fue derogado por las Reglas de Procedimiento Civil de 1979, excepto por sus Arts. 534 a 584, 586 a 616 y 620 a 637, entre otros, 32 L.P.R.A. secs. 2241 a 2471, 2491 a 2723 y 2821 a 2838, que continuaron en vigor conociéndose como la *Ley de Procedimientos Legales Especiales*. Véase la Regla 72 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Los artículos relacionados con el procedimiento de la adopción quedaron en vigor como parte de la Ley de Procedimientos Legales Especiales.

■ La Ley Núm. 86 de 15 de junio de 1953 (31 L.P.R.A. sec. 531 *et seq.*) regula el aspecto sustantivo de la adopción. En general establece los requisitos para ser adoptante,[7] para que se verifique el consentimiento del adoptado[8] y los efectos jurídicos de la adopción entre el adoptante y el adoptado,[9] así como entre el adoptado y su familia biológica.[10] Mantuvo, como *prohibición expresa*, que los tutores no podían ser adoptantes *"respecto de sus pupilos mientras no hayan rendido la cuenta final de la tutela y ésta haya sido aprobada por el tribunal"*. (Énfasis suplido.) Art. 136 del Código Civil, 31 L.P.R.A. sec. 537. Véanse: Art. 172(2) del Código Civil español; M. Fernández Martín Granizo, *La Adopción*, 24 An. Der. Civ. 683, 718–719 (1971); G. García Cantero, *El nuevo régimen de la adopción*, 24 An. Der. Civ. 789, 820–821 (1971). Esta medida garantiza contra posibles fraudes derivados de la tutela —E. Menéndez, *Lecciones de Derecho de Familia*, Río Piedras, Ed. U.P.R., 1976, pág. 315— excluye un posible medio de eludir las obligaciones y responsabilidades dimanantes de ésta —Díez-Picazo y Gullón, *op. cit.*, pág. 382; J.L. Lacruz Verdejo y F.A. Sancho Rebullida, *Elementos de Derecho Civil: Derecho de Familia*, Barcelona, Ed. Bosch, 1982, T. IV, pág. 668— y evita posibles perjuicios al adoptado ocasionados por una mala administración de sus bienes, R. De Marino, *La capacidad adopcional*, 24 An. Der. Civ. 863–880 (1971). La tutela a que se refiere este artículo puede ser tanto la legítima como la dativa o la testamentaria. Art. 167 *et seq.* del Código Civil, 31 L.P.R.A. sec. 661 *et seq.*

---

[7] Véanse Art. 130 del Código Civil, 31 L.P.R.A. sec. 531; *Ex parte Warren*, 92 D.P.R. 299 (1965).

[8] Art. 135 del Código Civil, 31 L.P.R.A. sec. 536.

[9] Arts. 132 y 134 del Código Civil, 31 L.P.R.A. secs. 533 y 535.

[10] Art. 133 del Código Civil, 31 L.P.R.A. sec. 534; *Ex parte J.A.A.*, 104 D.P.R. 551 (1976); *Feliciano Suárez, Ex parte*, 117 D.P.R. 402 (1986).

■ Los requisitos sustantivos para ser adoptante *son jurisdiccionales. Su incumplimiento priva de jurisdicción al tribunal. Ex parte Warren,* supra. Otros requisitos sustantivos son: el del consentimiento del adoptado en los casos que proceda, el de sus padres o tutor cuando sea necesario[11] y el del padre que lo haya reconocido —Art. 135 del Código Civil, 31 L.P.R.A. sec. 536— y el que los cónyuges adoptarán conjuntamente salvo lo dispuesto en el Art. 131 del Código Civil, 31 L.P.R.A. sec. 532.[12]

### III

*Aspectos procesales de la adopción*

■ La Ley Núm. 85 de 15 de junio de 1953 (32 L.P.R.A. secs. 2691 y 2692–2698) regula el aspecto procesal de la adopción. Una vez cumplidos estrictamente los requisitos sustantivos, la ley regula específica y detalladamente el procedimiento para obtener la autorización judicial para una adopción. *Feliciano Suárez, Ex parte,* supra, pág. 406.

■ El fin primordial que anima todo el procedimiento y que sirve de norte al tribunal para autorizar o no la adopción *es el bienestar y la conveniencia del adoptado.* Proyecto de la Ley Núm. 86 de 15 de junio de 1953, Diario de Sesiones,

---

[11] Nuestro Código Civil de 1902 retuvo aquella parte del Código Civil español referente al consentimiento de los adoptados mayores de edad y la referente al consentimiento de los incapacitados que debía otorgar el tutor. Añadió una variante en los casos de los menores de edad, donde el consentimiento debía otorgarlo el padre o tutor, pero si el menor contaba con 16 años si varón, o 14 si mujer, éste debía consentir. En 1948 se redujo esa edad a 10 años y en 1952 se dispuso que el tribunal podía dispensar ese requisito por justa causa.

[12] Hasta 1948, si uno solo de los cónyuges adoptaba debía obtener la autorización previa del otro. Mediante la Ley Núm. 100 de 6 de mayo de 1948, Leyes de Puerto Rico, pág. 229, se estableció que los cónyuges debían adoptar conjuntamente. De ahí que si uno de los cónyuges no cumple con los requisitos para ser adoptante, el otro no puede adoptar. Ley Núm. 452 de 14 de mayo de 1952, Leyes de Puerto Rico, pág. 92.

*supra*, pág. 1291 *et seq.*; Art. 613 del Código de Enjuicia-miento Civil, *supra*; *Ex parte J.A.A.*, supra, pág. 559; *Rivera Coll v. Tribunal Superior*, supra; *Valladares de Sabater v. Rivera Lazú*, supra; *Ex parte Warren*, supra. La interven-ción del Estado es intensa para asegurar al adoptado el me-jor o los mejores padres. E. González Tejera, *Bienestar del menor: señalamientos en torno a la patria potestad, custo-dia y adopción*, 54 Rev. Jur. U.P.R. 409, 465 (1985). Se persi-gue el propósito de que al adoptado se le provea, con carác-ter permanente, un hogar donde se le brinde cariño, cuidado, protección y seguridad económica, social y emocional, así como lo esencial para un crecimiento y desarrollo saludable en un medio ambiente donde disfrute sin distinciones de los mismos derechos y asuma las mismas obligaciones que los hijos biológicos.

■ Procesalmente la adopción es: (1) un acto solemne, *Feliciano Suárez, Ex parte*, supra; M. Albaladejo, *Curso de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. IV, pág. 270; (2) de carácter privado, Ley Núm. 452 de 14 de mayo de 1952, Leyes de Puerto Rico, pág. 923; 32 L.P.R.A. sec. 2696, y (3) por lo general, no contenciosa.

■ El procedimiento se inicia mediante la presentación de una solicitud jurada que contenga "todas las alegaciones que puedan servir de base para determinar la conveniencia de la adopción" ante el Tribunal Superior competente.[13] Art. 612 del Código de Enjuiciamiento Civil, *supra*. Una vez presentada la petición, si el adoptado es un menor o incapaci-tado el tribunal debe ordenar que, por conducto de la "De-pendencia de Bienestar Público" (entiéndase el Departa-

---

[13] El Tribunal Superior competente es aquel que radica en el distrito de residencia del peticionario. 8 L.P.R.A. sec. 10(3).

mento de Servicios Sociales),[14] se realice un estudio social donde se incluya las circunstancias de la petición, el historial social de los solicitantes, del menor o incapacitado y de sus padres biológicos, los planes del solicitante para con el futuro adoptado y cualesquiera otros hechos pertinentes a las relaciones entre el menor o incapacitado y sus futuros padres adoptivos. 32 L.P.R.A. sec. 2692.

El estudio social se vierte en un informe con las recomendaciones de la agencia sobre si conviene o no a los mejores intereses del menor o incapacitado permanecer bajo la custodia provisional de los peticionarios, bajo la supervisión temporal o permanente de la agencia, o si procede que se efectúe la adopción.

Este informe colocará al tribunal en condición y le servirá de guía, entre otros elementos, para decidir con quién quedan salvaguardados los intereses del menor. No debe entenderse que tal informe es "una limitación a la autoridad del tribunal en el ejercicio de su poder de *parens patria* para decidir sobre la adopción". 32 L.P.R.A. sec. 2692.

Rendido el informe, el tribunal citará a las partes a una vista. Son partes en este procedimiento: el o los adoptados; el o los adoptantes; el fiscal de distrito correspondiente o el Procurador de Relaciones de Familia; los padres del adoptado, cuando su presencia sea indispensable,[15] y en su defecto, el tutor o defensor judicial del menor designado;

---

[14] Mediante la Ley Núm. 171 de 30 de junio de 1968, los poderes y facultades de la División de Bienestar Público del Departamento de Salud fueron transferidos al Departamento de Servicios Sociales. 3 L.P.R.A. sec. 211d(a).

[15] La ley establece que no es indispensable la presencia de los padres o del tutor del adoptado en los casos en que los padres hayan renunciado previamente a la patria potestad del menor y transferido su custodia al Departamento de Servicios Sociales. 32 L.P.R.A. sec. 2691. En estos casos se ha consentido a la adopción previo a la vista. Debe notificarse del procedimiento, además, al padre o a la madre que haya abandonado a su hijo y cuyo paradero se ignore. En tal caso se le notifica copia de la solicitud, por correo certificado, a su última dirección conocida y por medio de avisos en un periódico de circulación general. 32 L.P.R.A. sec. 2693.

los consejeros y representantes del Departamento de Servicios Sociales, y los testigos.

██ La ley dispone que, en *circunstancias extraordinarias*, el tribunal *pueda* nombrar un tutor especial o defensor judicial quien consentirá o no a la adopción de un menor o incapacitado en su nombre. Una de estas circunstancias surge cuando el adoptado, *como en el caso de autos*, es huérfano de padre y de madre. 32 L.P.R.A. sec. 2693(1). En este caso, como veremos, no se nombró ese tutor especial.

██ Uno de los requisitos sustantivos de la adopción es el consentimiento. Durante la vista privada, tanto el adoptante como el adoptado (en caso de ser mayor de edad) —31 L.P.R.A. sec. 536— los padres o el tutor (en caso de ser menor o incapacitado) —31 L.P.R.A. sec. 536— y *los abuelos* (en caso de ser menor y que se desconozca el paradero de sus padres o éstos estén incapacitados mentalmente) —32 L.P.R.A. sec. 2693(5)—([16]) darán el consentimiento para verificar la adopción. *En el caso del menor huérfano, el tutor especial*, salvo que el menor tenga diez (10) años o más y no exista justa causa para dispensar su consentimiento, *es el llamado a consentir a la adopción.* 32 L.P.R.A. sec. 2693(1) y 31 L.P.R.A. sec. 536. De manera que, si bien la ley le da discreción al tribunal para que en tales circunstancias nombre un tutor especial, es altamente aconsejable tal nombramiento para asegurar que prevalezca el beneficio y conveniencia del menor. La solemnidad y rigurosidad del procedimiento así lo requieren. Nuestra ley guarda silencio sobre si en los casos de huérfanos menores de edad los abuelos deben ser oídos.

---

([16]) Nuestra ley no dispone que sean los abuelos quienes consientan a la adopción en casos de un huérfano. La excepción que aparece en 32 L.P.R.A. sec. 2693(5) es inaplicable a estos hechos.

En 1970, en España se produjo una reforma en materia de adopción al aprobarse la Ley Núm. 7 de 4 de julio de ese año. Esta ley dispone, en lo pertinente, que *"cuando se trate de huérfanos, serán también oídos los abuelos de línea del padre o madre premuertos"*. (Énfasis suplido.) Art. 173 del Código Civil español.

Adviértase que se trata de "ser oídos", no de consentir, como tal, a la adopción. Para la glosa moderna española, el *ser oídos*: "no podemos considerarle como un auténtico 'consentimiento' y sí únicamente como una simple manifestación u opinión acerca de la adopción, sin otra trascendencia que la de contribuir a formar la opinión del Juez sobre dicho acto", Fernández Martín Granizo, *supra*, pág. 722; "[e]xisten las personas que han de ser simplemente oídas por el juez para que éste pueda resolver con pleno conocimiento de todas las circunstancias concurrentes, pero sin que deba ser un obstáculo para su libre decisión la circunstancia de que 'comparezcan manifestando su criterio desfavorable a la adopción'", Puig Brutau, *op. cit.*, pág. 231, y "[e]l parecer de estas personas servirá al Juez para formar su convicción, pero no le vinculará en ningún sentido", García Cantero, *supra*, pág. 842.

Pasemos a revisar los procedimientos habidos en el tribunal de instancia.

## IV

*Los hechos*

Fruto de la relación consensual extramarital entre María A. A. y Julio E. M., nació el niño J.L.E.A. el 20 de noviembre de 1979.[17] Antes del nacimiento del niño, su padre murió.

---

[17] Anteriormente, María A. A. había procreado al recurrente, M.J.C.A., en su relación matrimonial con Manuel C. F. Ese matrimonio quedó disuelto por sentencia de divorcio dictada en 1975. Posteriormente, M.J.C.A. quedó bajo la

En 26 de agosto de 1981 su madre también falleció. Antes de su muerte, María otorgó testamento abierto ante notario en 12 de marzo de 1981. Expresó en el mismo, *inter alia*:

> "Que es su deseo hacer constar que en caso de su ausencia física, es decir, que a su deceso su hijo [J.L.E.A.] quede bajo la *tutela*, cargo, custodia, cuido y patria potestad de los abuelos paternos de su hijo . . . ." (Énfasis suplido.) Apéndice I, pág. 2.

Con posterioridad a la muerte de la madre, los abuelos paternos (recurrentes) presentaron una solicitud para adoptar a J.L.E.A. el 1ro de julio de 1982, la cual notificaron a la Procuradora de Relaciones de Familia y al Departamento de Servicios Sociales.

Pendiente la petición y ante el mismo tribunal, la abuela materna del menor, Francisca J. A., presentó el 31 de agosto de 1982 una demanda en la que solicitaba la custodia de dicho menor. El tribunal, ante el cual se encontraban sometidos ambos asuntos, ignoraba que las acciones se refiriesen al mismo menor.

En la acción sobre custodia, el tribunal de instancia otorgó a la abuela materna, provisionalmente, el derecho de tener de visita a J.L.E.A. durante algunos fines de semana. Ordenó, además, que el Departamento de Servicios Sociales rindiera un informe que lo pusiera en condiciones de resolver sobre la custodia del menor. Paralelamente a la acción de custodia, el tribunal de instancia refirió la petición de adopción de los abuelos paternos al Departamento de Servicios Sociales para que éste rindiera el correspondiente informe. Entre enero y marzo de 1983, la trabajadora social encargada del informe para adopción se entrevistó con la abuela materna. Ésta le expresó *su oposición hacia el plan de adopción de parte de los peticionarios* (sic). (Énfasis suplido.) Informe de 30 de marzo de 1983.

---

custodia de la abuela materna aquí recurrente mediante decreto judicial de 13 de octubre de 1982.

El 10 de marzo de 1983, luego de analizar el informe del Departamento de Servicios Sociales sobre la adopción, considerar sus recomendaciones y celebrar una vista donde intervinieron los recurrentes y la Procuradora de Relaciones de Familia (quien dio su aprobación para la adopción), el tribunal de instancia dictó una resolución para conceder la adopción solicitada por los recurrentes. Declaró a los abuelos paternos padres adoptivos del menor, ordenó el cambio de apellidos del adoptado al de aquéllos y concedió los demás efectos que la ley atribuye a una resolución de adopción.

Decretada la adopción el 1ro de junio de 1983, la abuela materna presentó en dicho pleito tres (3) escritos: (1) moción de reconsideración; (2) solicitud de intervención, y (3) solicitud de consolidación de ese caso con la acción de custodia instada por ella. En su moción de intervención solicitó la reconsideración de la sentencia, de suerte que se le permitiera intervenir para oponerse a la adopción. Según ella, le asistía tal derecho. En su moción de reconsideración mostró su sorpresa ante la celebración de la vista de adopción ya que, según ella, los recurrentes le ocultaron al tribunal el hecho de que existía una controversia en relación con la custodia del menor. Los recurrentes presentaron su oposición oportunamente.

El 20 de julio de 1984, luego de que las partes sustentaran sus respectivas posiciones por escrito, el tribunal de instancia denegó la solicitud de intervención de la abuela materna. En síntesis, concluyó que ni la abuela materna ni el hermano del adoptado tenían capacidad jurídica para intervenir en el procedimiento de adopción. En vista de que fueron cumplidos los trámites del procedimiento, notificados los funcionarios pertinentes y rendido el correspondiente informe de la agencia concernida, concluyó el tribunal que la sentencia de adopción era válida.

El tribunal, además de denegar la solicitud de nulidad del procedimiento, dictó el 29 de agosto de 1984 una resolución en el pleito de custodia donde decretaba su archivo por académico.

Transcurridos cinco (5) meses de dictada la sentencia de adopción, la abuela materna presentó ante el tribunal de instancia una nueva solicitud de intervención y petición de nulidad de la misma. Adujo esta vez, esencialmente, los mismos fundamentos considerados por ese foro. El 10 de enero de 1985 el tribunal denegó esta segunda solicitud de intervención en base a que, una vez notificada de la sentencia, la abuela materna pudo y debió recurrir en alzada ante este Tribunal y no lo hizo.

Inconforme, el 5 de marzo de 1985 la abuela materna instó recurso de *certiorari* ante nos (0-85-130). Solicitó la revisión de la resolución que le negó su intervención postsentencia en el pleito de adopción. En ese recurso levantó, esencialmente, los mismos fundamentos considerados por el tribunal de instancia en las dos (2) mociones de intervención. El 28 de marzo de 1985 denegamos la solicitud de *certiorari*.

Agotada la vía de revisión ante nos, el 8 de abril de 1985 la abuela materna presentó un pleito independiente de nulidad de la sentencia y del procedimiento de adopción. En el nuevo pleito, se reprodujeron todos los planteamientos objeto de los trámites anteriores en el tribunal de instancia y ante nos, y se incluyó como parte al hermano del menor adoptado. Los recurrentes contestaron la demanda y levantaron, como defensas afirmativas, la falta de capacidad jurídica de los demandantes para iniciar el pleito y la de cosa juzgada. Presentaron, además, una solicitud para que se dictara sentencia sumaria en su favor. Apoyaron tal solicitud en la defensa de cosa juzgada a la luz de los documentos judiciales y de los trámites anteriores en los que se decretó la adopción y se le negó la intervención a la abuela materna.

Los recurridos presentaron una moción en oposición sin acompañar documento alguno ni contra declaración jurada en oposición a que se dictara sentencia sumaria. Tampoco solicitaron vista para discutir la moción. Así las cosas, el tribunal de instancia dictó sentencia sumaria contra los promoventes (aquí recurrentes) de la moción y anuló la sentencia de adopción. El dictamen del foro de instancia se fundamentó en que en el procedimiento de adopción se privó a la abuela materna de su "derecho a ser notificada y oída" en violación al debido proceso de ley, y en que los abuelos paternos incurrieron en *conducta que penetra más allá del aura de lo que constituye un fraude al Tribunal*" —(énfasis suplido) Apéndice I, pág. 6— al guardar silencio u ocultar la acción por la custodia del menor que *estaba sub júdice ante la misma sala y en la que se había concedido a la abuela materna los "derechos de visitación"*.

Es de esa sentencia que recurren los abuelos paternos ante nos. Decidimos revisar. Estamos en posición de resolver y así lo hacemos.

## V

*La sentencia sumaria*

En el caso de autos los recurrentes solicitaron sentencia sumaria en su favor. Apoyaron su solicitud en la defensa de cosa juzgada y fundaron la misma en las resoluciones y sentencias previas acreditativas, según ellos, de que las cuestiones presentadas en el pleito de nulidad del procedimiento de adopción ya habían sido adjudicadas en contra de los recurridos. Los recurridos, por su parte, apoyaron su oposición en que se les había violado el debido proceso de ley al negárseles su derecho a intervenir en el procedimiento de adopción. También argumentaron que no se nombró un tutor que representara a los menores en el proceso, en violación a los requisitos procesales de la adopción.

 No cabe duda que un tribunal puede dictar sentencia sumaria en favor de la parte no promovente si de los autos y los documentos presentados en apoyo y oposición de dicha moción surge que no existe controversia en cuanto a los hechos esenciales y que, como cuestión de derecho, procede que se dicte la misma en favor de dicha parte. Regla 36.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III; 10A *Wright, Miller and Kane, Federal Practice and Procedure: Civil 2d* Sec. 2720 (Supp. 1988); C. Clark, *The Summary Judgment*, 36 Minn. L. Rev. 567, 570–571 (1952). La sentencia sumaria es un remedio extraordinario que sólo debe concederse cuando el derecho del oponente surge con claridad y cuando el promovente ha tenido una oportunidad adecuada de demostrar que el oponente no tiene derecho a que se dicte sentencia en su favor como cuestión de derecho. *Wright, Miller and Kane*, supra, pág. 34; *Fountain v. Filson*, 336 U.S. 681 (1949). Reiteradamente hemos establecido que la misma sólo procede cuando el tribunal tenga ante sí la verdad sobre todos los hechos pertinentes, *Corp. of Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714, 721 (1986); *Roth v. Lugo*, 87 D.P.R. 386, 397 (1963), y no exista una verdadera controversia de hechos entre las partes. *Flores v. Municipio de Caguas*, 114 D.P.R. 521, 525 (1983).

 Un tribunal puede, mediante sentencia sumaria, determinar la nulidad de un decreto de adopción que fue dictado en violación a los requisitos de carácter jurisdiccional del procedimiento de adopción. En tal caso se trata de un decreto emitido sin jurisdicción sobre la materia y, por lo tanto, puede ser atacado colateralmente en un pleito independiente.

En el caso de autos procedía dictar sentencia sumaria que declarara la nulidad del decreto de adopción por haberse dictado éste sin jurisdicción y en violación a los requisitos procesales y sustantivos antes reseñados. Veamos.

# VI.

*Violación a los requisitos procesales y sustantivos de la adopción*

■ . (a) Ninguno de los requisitos o de las prohibiciones sustantivas de nuestro ordenamiento jurídico sobre adopción impide que un ascendiente adopte a un descendiente.(18) Al respecto, Díez-Picazo analiza el asunto y concluye: "La adopción de un descendiente por el ascendiente fue admitida en el Derecho romano, pero quedó excluida en el Derecho posterior por la exigencia de que el adoptante no tuviera descendencia. La desaparición de este precepto no impide hoy formalmente este tipo de adopción (p. ej., del nieto por el abuelo) . . . ." Díez-Picazo y Gullón, *op. cit.*, pág. 382.

■ Sin embargo, la ley establece una *prohibición expresa* al tutor en cuanto a la adopción del pupilo *hasta tanto aquél no rinda cuentas y el tribunal las apruebe.* En este caso la madre del menor estableció, mediante testamento, que los abuelos paternos tendrían "la tutela, cargo, custodia, cuido y patria potestad" del menor y los eximió del requisito de prestación de fianza. Tal disposición instituyó una tutela testamentaria sobre el menor. Art. 174 del Código Civil, 31 L.P.R.A. sec. 681.

De hecho, los abuelos paternos recurridos tenían la custodia física del menor desde 1981, cinco (5) meses antes de ocurrir la muerte de su madre. Luego de esa fecha, el menor ha seguido bajo la custodia de los recurrentes, quienes le han

---

(18) Originalmente, la Sec. 211 del Código Civil de 1902, proveniente del Código Civil español, establecía que sólo podía adoptar el que no tuviese hijos legítimos o legitimados, de suerte que sólo podía adoptar el que no tenía descendientes. En 1940 fue enmendado para establecer que podían adoptar aquellos que tuviesen descendientes mayores de edad, previa la autorización de éstos en la escritura pública de adopción. Ley Núm. 46 de 19 de abril de 1940. En 1948 esta disposición fue enmendada para disponer que podían adoptar aquellos que no tuviesen más de un hijo menor de edad y que obtuviesen el consentimiento de los hijos mayores de edad. Ley Núm. 100, *supra.* En 1953 se eliminaron esas barreras. Ley Núm. 86 de 15 de junio de 1953 (31 L.P.R.A. sec. 536).

brindado alimentación, educación y han administrado el cheque de $327 que el menor recibe en concepto de beneficiario del Seguro Social federal. Esas actuaciones demuestran la aceptación de los recurrentes del cargo de tutores testamentarios del menor.

De los autos no se desprende que, previo o durante el procedimiento de adopción, los recurrentes rindieran cuentas sobre la tutela del menor o que el tribunal de instancia las aprobare. El incumplimiento con ese requisito descualificó a los recurrentes como posibles adoptantes y privó al tribunal de instancia de jurisdicción, hasta tanto no se verificasen las correspondientes operaciones sobre la tutela. Arts. 218 a 226 del Código Civil, 31 L.P.R.A. sec. 801 *et seq.*

(b) Además, este caso presenta particularidades especiales que hacían forzoso, más que altamente aconsejable, el que se le nombrara un tutor especial al menor. Se trata de un menor huérfano cuya madre expresa como última voluntad que éste quedase bajo la patria potestad y custodia de sus abuelos paternos. Éstos, a su vez, solicitan su adopción, mientras que su abuela materna solicita la custodia. Ante tales posiciones contenciosas, era necesario el nombramiento de un tutor especial imparcial que velara por los mejores intereses del menor.

(c) Por otra parte, en el caso de autos la abuela materna no fue citada y, por lo tanto, no fue oída en el procedimiento de adopción. En casos donde unos abuelos *de un menor huérfano de padre y de madre* tramitan su adopción, los otros abuelos deben ser oídos para contribuir a formar la decisión del juez sobre dónde reside la conveniencia y bienestar del menor, y si la adopción es la alternativa más beneficiosa para éste. Ello implica que ambos abuelos deben ser citados, brindándoles así la oportunidad de expresarse sobre la adopción. Aun cuando comparezcan para manifestar su

oposición, queda a discreción del tribunal la determinación de si concede la adopción del menor o no. Como regla general, su incomparecencia, una vez debidamente citados, no impedirá que continúe el procedimiento. En aquellos casos en que los abuelos paternos o maternos sean nombrados tutores especiales del menor (a tenor con lo dispuesto en 32 L.P.R.A. sec. 2693), éstos, por ser tutores, vienen llamados a dar su consentimiento.

## VII

*Las alternativas que pueden ser consideradas en casos de esta naturaleza*

En el caso de autos los abuelos paternos del menor huérfano quieren convertirse en padres de éste mediante la adopción. Ello desvincularía al menor de su familia biológica por la línea materna, lo cual no tiene que ser así necesariamente. Examinemos varias alternativas que debe considerar el tribunal.

■ (a) Como norma general, "la adopción desarraiga al adoptado de todo vínculo de parentesco y de todo derecho respecto de su familia biológica. Borra la anterior filiación. Para todos los efectos, el adoptado se considera como si hubiese nacido hijo del adoptante". *Rivera Coll v. Tribunal Superior*, supra, pág. 332.

■ Sin embargo, a dicha norma general le señalamos una excepción en *Ex parte J.A.A.*, supra, pág. 558, al reconocer que "[c]uando el adoptante sea una *sola persona*, y ésta no sea cónyuge del padre o madre del niño . . . el tribunal, en vista de las circunstancias específicas de cada caso, deberá decidir si la ruptura del parentesco biológico del adoptado opera respecto de ambas líneas, la paterna y la materna, o respecto de una sola. Nada hay en la ley que impida que el adoptado, al adquirir un padre adoptivo siga vinculado en su parentesco natural con su madre biológica, y viceversa".

█ El fundamento para tal excepción es igualmente válido para sostener que en el caso de autos, al tratarse de un menor huérfano de padre y de madre, con un hermano biológico por la línea materna y cuyos ascendientes de primer grado por ambas líneas han demostrado un gran interés en su bienestar, el tribunal de instancia considere la alternativa de conceder la adopción a los abuelos paternos sin desvincularlo totalmente de su relación con su parentesco biológico por la línea materna.

█ (b) Además, nada impide que los tribunales, en casos análogos a éste, no concedan la adopción y opten por conceder la patria potestad a los abuelos paternos y derechos de visita a la abuela materna; la patria potestad y custodia a la abuela materna y derechos de visita a los abuelos paternos; la patria potestad a los abuelos paternos con la custodia compartida entre abuelos de ambos vínculos; la patria potestad a la abuela materna y custodia compartida entre abuelos de ambos vínculos, así como otro tipo de relaciones con las condiciones que estimen adecuadas y pertinentes.

Las alternativas anteriores deberá analizarlas el tribunal a base de los hechos ante sí y de la actualización del estudio social —mandatorio en estos casos— para optar por la alternativa que beneficie y sea conveniente para el menor.

El informe social es importante, pues de éste contener la información requerida por ley, resulta de valiosa ayuda al juzgador. Deberá sopesar, además, la prueba que aporten los peticionarios de la adopción, así como el testimonio de la abuela materna. Esto pondrá al tribunal en condiciones de determinar dónde residen los mejores intereses del menor y cuál debe ser el remedio más adecuado: la adopción o las alternativas antes discutidas.

En resumen, por haber sido dictado sin jurisdicción el decreto de adopción, al violarse los requisitos procesales y

sustantivos del procedimiento procedía la sentencia sumaria en favor de los recurridos. En consecuencia, se dictará sentencia que decrete la nulidad de la adopción y devuelva el caso al foro de instancia para que, luego de notificar a las partes, celebre una vista en su fondo con intervención de la abuela materna para determinar si procede conceder o denegar la adopción, y dictaminar sobre la patria potestad y custodia del menor de acuerdo con su mejor bienestar y conveniencia.

En dicha vista se le nombrará un defensor judicial al menor objeto de las peticiones de adopción y de custodia, y se le dará oportunidad a los abuelos paternos para que rindan las cuentas actualizadas de la tutela.

Por los fundamentos antes expuestos, *se modifica la sentencia sumaria para que se dictamine la nulidad del decreto de adopción y, así modificada, se confirma. Se devuelve el caso al tribunal de instancia para que continúen los procedimientos de conformidad con lo expuesto en la opinión que antecede y dictamine lo que en derecho proceda. Se dictará la correspondiente sentencia de conformidad con lo aquí resuelto.*

El Juez Asociado Señor Negrón García no intervino.