Opinión disidente emitida por
el Juez Presidente Señor Hernández Denton,
a la cual se unen la Jueza Asociada Señora Fiol Matta y la Juez Asociada Señora Rodríguez Rodríguez.
Hoy, unos abuelos se ven imposibilitados de adoptar al nieto que han criado como si fuese un hijo por el mero hecho de que la madre del menor se relaciona con este. Por estar este Tribunal igualmente dividido, se confirma una sentencia del Tribunal de Apelaciones que denegó la adop-ción por el fundamento principal de que lo que estos abue- *909 los pretenden contravendría la política pública y la norma-tiva sobre la adopción. No estamos de acuerdo con una interpretación tan restrictiva de la ley, sobre todo cuando, como sucede en este caso, su aplicación lleva a un resul-tado contrario a los mejores intereses del menor. El bien-estar del menor es, precisamente, el bien jurídico que por ley venimos llamados a proteger. Por estas razones, las cuales se detallan a continuación, hubiésemos revocado la sentencia del Tribunal de Apelaciones y permitido la adop-ción del menor por sus abuelos, los peticionarios.
I — I
La Sra. Gloria Ileana Carrillo Colón tenía catorce años cuando dio a luz al menor S.A.C. en 1999. Desde que nació, el menor ha vivido en casa de sus abuelos maternos, el Sr. Samuel Carrillo Vázquez y la Sra. Ana I. Colón Ortiz. Ini-cialmente, el menor vivió allí junto a su madre biológica. Posteriormente, cuando el niño tenía cinco años, su madre se fue a vivir con su entonces compañero sentimental, que-dándose su hijo bajo la guarda de sus abuelos maternos, con quienes vive hasta hoy. El menor reconoce que la se-ñora Carrillo Colón es su madre biológica, refiriéndose a ella como “mami”. Sin embargo, le dice “papi” a su abuelo, aun cuando conoce a su presunto padre biológico, quien no lo ha reconocido como su hijo.(1)
Así las cosas, el 18 de julio de 2008, el señor Carrillo Vázquez y la señora Colón Ortiz presentaron ante el Tribunal de Primera Instancia, Sala de Guayama, una peti-ción para adoptar a su nieto S.A.C., quien para esa fecha *910 tenía nueve años.(2) A tales efectos, expusieron que gozan de buena reputación en la comunidad y que están en con-dición de continuar proveyéndole al menor un hogar esta-ble, sano y moral, y de atender sus necesidades emociona-les, materiales y económicas. Además, revelaron que su fuente de ingresos consiste de los beneficios que el señor Carrillo Vázquez recibe en calidad de veterano.
La solicitud de adopción vino acompañada de una decla-ración jurada otorgada por la señora Carrillo Colón, madre biológica del menor e hija de los peticionarios, en la que esta consiente a que sus padres —los abuelos de S.A.C.— adopten a su hijo.(3) Asimismo, la trabajadora social del Departamento de la Familia y la Procuradora de Asuntos de Familia no se opusieron a la solicitud de adopción, pues coincidieron en que los peticionarios tienen la capacidad para garantizar el bienestar del menor. Así lo manifestaron en una vista celebrada el 20 de octubre de 2008 por el Tribunal de Primera Instancia.
No obstante, el foro primario denegó la petición por en-tender que esta desvirtúa el enfoque de nuestra normativa sobre adopción. Razonó que esa normativa salvaguarda el interés social de niños maltratados, desamparados, aban-donados y sin hogar alguno, consideraciones que, según ese foro, están ausentes en este caso. De igual forma, concluyó que la petición está motivada por el deseo de que el menor cuente con mayor protección económica. Sobre este particular, sostuvo que una adopción no puede basarse mera-mente en la determinación de que, económicamente, el me-nor estará mejor con los adoptantes.
Inconformes, los peticionarios presentaron una moción *911 para solicitar determinaciones de hechos adicionales. Esa moción fue denegada por el Tribunal de Primera Instancia. (4)
Así las cosas, los peticionarios acudieron ante el Tribunal de Apelaciones. La Procuradora General compareció y se expresó a favor de la adopción solicitada. No obstante, el foro apelativo intermedio confirmó la decisión del tribunal de instancia de denegar la adopción. El foro entendió que la relación que la madre biológica pretende seguir teniendo con su hijo es contraria al mandato de que, mediante la adopción, se rompa todo vínculo legal con la familia biológica. Razonó que el legislador contempló un rompi-miento de vínculos, no una conversión de madre a hermana. Según el Tribunal de Apelaciones, tal situación crearía una confusión en la psiquis del niño, la cual hace que la adopción no propenda al mejor interés y bienestar del menor. Este elemento, entendió el juzgador apelativo, no fue considerado por la trabajadora social. Ese foro con-cluyó, además, que la madre biológica del menor no quería o no comprendía las consecuencias de la adopción, razón por la cual su consentimiento estuvo viciado y procedía desestimar la acción. Por último, el foro apelativo interme-dio concluyó que lo único que se lograba con esta adopción era que el menor se beneficiara de la compensación por incapacidad que su abuelo, el señor Carrillo Vázquez, reci-bía en calidad de veterano. Tal beneficio económico, con-cluyó, no podía ser el fundamento para cambiar la filiación de un menor. Según el Tribunal de Apelaciones, la custodia es la figura legal que permitiría formalizar la responsabi-lidad que los abuelos asumieron con el menor, sin que la *912 madre biológica rompa sus vínculos legales con él y sin causarle una confusión en sus relaciones afectivas.
Insatisfechos con este dictamen, los peticionarios acu-dieron ante nos mediante un recurso de certiorari. En esencia, alegan que el Tribunal de Apelaciones erró al resolver que la petición de adopción es contraria a la política pública y a la normativa en materia de adopción, por el mero hecho de que la madre biológica continuaría relacio-nándose con su hijo. El 8 de octubre de 2009 expedimos el recurso solicitado. Oportunamente, los peticionarios pre-sentaron su alegato. Por su parte, la Procuradora General compareció y, una vez más, se expresó a favor de la adop-ción solicitada. Establecidos los hechos pertinentes y el tracto procesal del caso, repasemos el derecho aplicable a la controversia.
II
A. Los abuelos desempeñan un papel fundamental en nuestra sociedad, interviniendo activamente en las vidas de sus nietos cada vez con mayor frecuencia. Rexach v. Ramírez, 162 D.P.R. 130, 136 y 156 (2004). A tales efectos, en Alonso García v. S.L.G., 155 D.P.R. 91, 100-101 (2001), expresamos:
La sociedad puertorriqueña ha reconocido tradicionalmente que los abuelos son una figura esencial en la formación y de-sarrollo de los nietos. Hoy, son muchos los abuelos que atien-den y cuidan a sus nietos mientras ambos padres trabajan en busca de unos ingresos proporcionados al costo de vida. Co-múnmente, los abuelos se preocupan por la salud, la alimen-tación, el bienestar y la seguridad de sus nietos. Además, se esmeran en brindarles cariño, atención y orientación. (Esco-lios omitidos.)
Así como hay abuelos cuyo rol es el de atender y cuidar a sus nietos mientras los padres trabajan, existen abuelos que tienen la responsabilidad de criar a sus nietos. Según
*913 estadísticas del Negociado del Censo de Estados Unidos (U.S. Census Bureau), en Puerto Rico, 59,815 abuelos son responsables por sus nietos menores de dieciocho años; de ese número, 40,187 son casados (67.2%) y 37,860 son mu-jeres (63.3%).(5) Por otro lado, las adopciones de nietos por sus abuelos son comunes en Puerto Rico. De acuerdo con estadísticas de la Administración de Familias y Niños (ADFAN), durante los últimos cinco años, entre el 16% y el 24% de los menores adoptados en Puerto Rico han sido adoptados por sus abuelos. Así, por ejemplo, durante los primeros siete meses del año fiscal 2009-2010, treinta y ocho de los doscientos cuarenta menores adoptados en el país (15.8%) fueron adoptados por sus abuelos.(6)
B. Por otro lado, hemos definido la adopción como un acto jurídico solemne que supone la ruptura total del vín-culo jurídico-familiar de una persona con su parentela bio-lógica y la consecuente filiación de ésta con quienes han expresado la voluntad de que legalmente sea su hijo. López v. E.L.A., 165 D.P.R. 280, 299 (2005); Virella v. Proc. Esp. Reí. Fam., 154 D.P.R. 742 (2001); Feliciano Suárez, Ex parte, 117 D.P.R. 402 (1986). A través de esta institución, la relación filiatoria adoptiva se equipara con aquella que se produce naturalmente, con iguales deberes y obligaciones jurídicas y sociales. López v. E.L.A., supra; Zapata et al. v. Zapata et al., 156 D.P.R. 278 (2002).
Mediante la adopción se busca atender el problema social de los niños abandonados y maltratados. Sobre la fun-ción social de esa institución jurídica, hemos indicado que esta cumple varios fines, siendo el principal darles a los niños sin padres la oportunidad de criarse en un hogar *914 donde puedan ser atendidos debidamente y facilitar a los padres sin hijos la oportunidad de tenerlos y asegurar así la continuidad de su familia. López v. E.L.A., supra, pág. 300; M.J.C.A., menor v. J.L.E.M., menor, 124 D.P.R. 910 (1989); Feliciano Suárez, Ex parte, supra.
En nuestra jurisdicción, el acto jurídico de la adopción está rigurosamente reglamentado por el Código Civil, 31 L.P.R.A. sees. 531 — 539, en su dimensión sustantiva, y por la Ley de Procedimientos Legales Especiales —antes Có-digo de Enjuiciamiento Civil, 32 L.P.R.A. sees. 2699-2699s— en su dimensión procesal. López v. E.L.A., supra; Virella v. Proc. Esp. Reí. Fam., supra; Feliciano Suárez, Ex parte, supra.
Respecto a su vertiente procesal, la Ley Núm. 9 de 19 de enero de 1995 (32 L.P.R.A. see. 2699 et seq.) enmendó la Ley de Procedimientos Legales Especiales con el fin de su-perar los serios escollos y las dilaciones innecesarias que caracterizaban el procedimiento de adopción hasta ese momento. López v. E.L.A., supra, págs. 299-300. Hemos afirmado que la intención legislativa de dicha ley “va diri-gida a prestar particular atención a los menores maltrata-dos, abandonados y desamparados, para que mediante los mecanismos de adopción, éstos puedan formar parte de ho-gares estables, donde a su vez encuentren la felicidad, el amor, la protección y el desarrollo físico, psicológico, mental y moral”. (Énfasis suprimido.) íd., pág. 300.
Por otro lado, la Ley Núm. 8 de 19 de enero de 1995 (31 L.P.R.A. see. 531 et seq.) enmendó el capítulo del Código Civil que regula los aspectos sustantivos de la adopción. Sobre ese estatuto hemos dicho que la intención del legis-lador fue “flexibilizar la institución de la adopción para que pueda ser ampliamente utilizada por personas que desean adoptar menores de edad”. (Énfasis en el original.) López v. E.L.A., supra, pág. 301.
Mediante las referidas Leyes Núms. 8 y 9 de 1995, supra, se adoptó en Puerto Rico lo que el legislador describió *915 como “una de las legislaciones más avanzadas y liberales de todos los países occidentales en materia de adopción [,] siendo su espíritu claramente autóctono, ajustado a la rea-lidad de la vida actual de la sociedad puertorriqueña, y protector de[l] bienestar y [la] conveniencia del adoptando”. López v. E.L.A., supra, pág. 301, citando a 1995 (Parte 1) Leyes de Puerto Rico 47.
Ahora bien, conviene recordar que, previo a la aproba-ción de las Leyes Núms. 8 y 9 de 1995, supra, la institución de la adopción “fue considerada como una de carácter esen-cialmente social dirigida primordialmente a dar padres a niños que nos los tuvieran, o cuyos padres no los quisieran o no los pudieran atender debidamente”. (Enfasis suplido y en el original.) íd., pág. 302, citando a Ex parte J.A.A., 104 D.P.R. 551, 558 (1976).
Reiteradamente, hemos indicado que el propósito primordial de la adopción es el bienestar del menor. López v. E.L.A., supra; Zapata et al. v. Zapata et al., supra. El Art. 2 de la Ley para el Bienestar y la Protección Integral de la Niñez, Ley Núm. 177 de 1 de agosto de 2003 (8 L.P.R.A. see. 444 et seq.), define el mejor interés del menor como “el balance entre los diferentes factores que pueden afectar la seguridad, salud, bienestar físico, mental, emocional, edu-cativo, social y [cualquier] otro dirigido a alcanzar el desa-rrollo óptimo [del] menor”. (Corchetes en el original y suplidos.) 8 L.P.R.A. sec. 444(u).
Respecto a la interpretación del conjunto de normas sustantivas y procesales de la adopción, hemos expresado que estas deben ser interpretadas liberalmente a favor del adoptado. Sin embargo, esa liberalidad no puede llevar a que se viole la intención legislativa ni a consagrar absurdos. López v. E.L.A., supra, pág. 303; Virella v. Proc. Esp. Reí. Fam., supra.
Debe añadirse que, recientemente, la Asamblea Legisla-tiva aprobó la Ley de Reforma Integral de Procedimientos de Adopción de 2009, Ley Núm. 186 de 18 de diciembre de *916 2009 (8 L.P.R.A. see. 1051 et seq.). Ese estatuto incorporó la opción de “madres donantes voluntarias” a nuestro ordena-miento sobre adopción, dispuso para la creación de un re-gistro de personas interesadas en adoptar y estableció un proceso de convalidación de las adopciones llevadas a cabo fuera de Puerto Rico. En la Exposición de Motivos de la Ley Núm. 186, pág. 2, el legislador describe la adopción como “una alternativa real y una opción de amor en bene-ficio de todos, cuando por diversas circunstancias nuestros niños no encuentran en sus padres biológicos el amor y afecto que por derecho natural deben recibir”. (Enfasis suplido.) Su objetivo es “velar por el mejor interés del adop-tado y amparar su derecho a desarrollarse en el seno de una familia que le brinde el afecto y le procure los cuidados que satisfagan sus necesidades espirituales y materiales, cuando ello no le pueda ser proporcionado por sus padres biológicos”. (Enfasis suplido.) íd. Así, pues, el bienestar del menor es el criterio rector, aun cuando este fundamento esté reñido con la unidad familiar. Sobre este particular, el legislador expresa:
Se ha constatado que el bienestar y la seguridad de los me-nores, en muchos casos, se han visto comprometidos por la obMecada intención de lograr la unidad familiar, aun en casos donde las circunstancias de dicho seno familiar van en detri-mento del bienestar de los menores. Aun cuando el principio de unidad familiar es esencial, ... el fundamento principal siempre debe ser el bienestar y la seguridad del menor, brin-darle un ambiente adecuado en el hogar, de modo que se sienta amado y que se pueda desarrollar física, mental, social y moralmente, además de proveerle una convivencia sana, llena de orden, paz y tranquilidad. (Énfasis suplido.) íd., pág. 3.
Como mencionáramos, este estatuto estableció un sis-tema de “madres donantes voluntarias”. Según esta alter-nativa, “la mujer embarazada acuerda con unos prospecti-vos padres adoptivos, la entrega de su recién nacido, a partir de su nacimiento”. íd. Mediante la institución de este sistema, el legislador quiso posibilitar un proceso ex- *917 pedito de adopción que sirviera para “velar por el mejor interés del adoptado y amparar su derecho a desarrollarse en el seno de una familia que le brinde el afecto y le procure los cuidados que satisfagan sus necesidades espiritua-les y materiales, cuando ello no le pueda ser proporcionado por sus padres biológicos”. (Enfasis suplido.) Id.
Por otro lado, hemos resuelto que ninguno de los requisitos o de las prohibiciones sustantivas de nuestro ordenamiento sobre la adopción impide que un ascendiente adopte a un descendiente.(7) M.J.C.A., menor v. J.L.E.M., menor, supra, pág. 931. Sobre este particular, D[í]ez-Picazo ha señalado que:
“La adopción de un descendiente por el ascendiente fue ad-mitida en el Derecho romano, pero quedó excluida en el Dere-cho posterior por la exigencia de que el adoptante no tuviera descendencia. La desaparición de este precepto no impide hoy formalmente este tipo de adopción (p. ej., del nieto por el abuelo) ...”. L. Diez-Picazo y A. Gullón, Sistema de Derecho Civil, 3ra ed., Madrid, Ed. Tecnos, 1983, Vol. IV, pág. 382, citado en M.J.C.A., menor v. J.L.E.M., menor, supra, pág. 931.
De otra parte, el Art. 3 de la Ley Núm. 9 de 19 de enero de 1995, supra, la cual regula el procedimiento de adop-ción, establece que la petición deberá contener lo siguiente:
(f) Información sobre custodia legal y de facto del adoptado en caso de que éste sea menor de edad.
*918 Esta incluirá datos referentes a la relación previa existente entre el adoptado y el adoptante, la cual luego de corroborada y analizada en sus méritos podrá ser considerada como ele-mento fundamental para establecer prioridad en el proceso de selección de padres adoptivos.
A tales efectos se deberá incluir, pero sin limitarse a, lo si-guiente:
(A) Relación por vínculos de consanguinidad, afinidad o me-diante la custodia provisional autorizada por el Departamento de la Familia o por algún tribunal competente.
(B) Período de convivencia del adoptado con el adoptante, el motivo y la duración del mismo.
(C) Aportaciones económicas y de cualquiera índole que ha hecho el adoptante al mejoramiento físico, emocional e intelec-tual del adoptado, entre otras. (Énfasis suplido.) 32 L.RR.A. sec. 2699b(l)(f).
Como puede verse, el legislador autorizó a los tribunales para considerar la “relación previa existente” entre el adoptado y el adoptante como un “elemento fundamental para establecer prioridad” a la hora de seleccionar padres adoptivos. A tales efectos, requirió que la petición estable-ciera, entre otras cosas, la relación por vínculos de consan-guinidad y el período de convivencia del adoptado con el adoptante.
De otra parte, el Art. 2(10) de la Carta de los Derechos del Niño, Ley. Núm. 338 de 31 de diciembre de 1998 (1 L.P.R.A. see. 412(10)), declara que, excepto cuando sea adoptado por personas ajenas a la familia, todo niño en Puerto Rico tendrá derecho a “continuar relacionándose con aquellos miembros de la familia que tienen significa-ción para él o ella ... siempre que la relación sea en su interés”. Si bien esta disposición se refiere a los casos en los que la separación ocurre por muerte de uno de los pro-genitores o por divorcio, igual espíritu debe reinar en las circunstancias de este caso.
Ahora bien, como regla general, la adopción desarraiga al adoptado de todo vínculo de parentesco y de todo dere-cho respecto de su familia biológica. M.J.C.A., menor v. J.L.E.M., menor, supra, pág. 933; Rivera Coll v. Tribunal *919 Superior, 103 D.P.R. 325, 332 (1975). Sin embargo, a esta norma le hemos reconocido una excepción. En Ex parte J.A.A., 104 D.P.R. 551, 558 (1976), resolvimos que “[n]ada hay en la ley que impida que el adoptado, al adquirir un padre adoptivo siga vinculado en su parentesco natural con su madre biológica, y viceversa”. Ese caso trataba de una mujer soltera que solicitó adoptar a la hija de su ex com-pañero sentimental. El Tribunal de Primera Instancia de-negó la petición. Al revocar recalcamos el hecho de que la niña no había conocido otra madre que no fuera la peticionaria. En consideración de ello, expresamos que la adopción venía a “consagrar ante la ley la situación de he-chos que la niña ha conocido dura toda su corta vida”. Id., pág. 560.
De otra parte, en M.J.C.A., menor v. J.L.E.M., menor, supra, atendimos una petición de adopción presentada por los abuelos paternos de un menor huérfano. Esa adopción hubiera desvinculado al menor de su familia biológica por la línea materna. No obstante, sostuvimos que, según lo resuelto en Ex parte J.A.A., supra, ello no tenía que ser así necesariamente. M.J.C.A., menor v. J.L.E.M., menor, supra, pág. 933. Así, pues, reconocimos “la alternativa de conceder la adopción a los abuelos paternos sin desvincular totalmente al menor de su relación con su parentesco bio-lógico por la línea materna”. íd., pág. 934. Asimismo, ex-presamos que nada impide que los tribunales consideren otras alternativas, con el fin de identificar la opción más beneficiosa para el menor. Id.
Lo expresado en M.J.C.A., menor v. J.L.E.M., menor, supra, sirvió de base para nuestra decisión en Virella v. Proc. Esp. Reí. Fam., supra. Ese caso trataba también sobre la adopción de una nieta por sus abuelos. Distinto al caso anterior, allí la menor no era huérfana. No obstante, sus abuelos paternos se habían hecho cargo de la niña desde su infancia. Así las cosas, los abuelos presentaron una peti-ción de adopción conjunta. El padre biológico —el hijo de *920 los peticionarios— consintió a la adopción, pero la madre biológica se opuso porque quería retener la patria potestad y custodia legal sobre su hija, y deseaba que esta última conservase su segundo apellido. En vista de ello, se en-mendó la petición de adopción para que el abuelo paterno apareciese como adoptante individual. El tribunal de ins-tancia autorizó la adopción individual por el abuelo, actua-ción que fue confirmada por el Tribunal de Apelaciones. No obstante, este Tribunal revocó tras resolver que, conforme al Art. 133 del Código Civil, 31 L.P.R.A. see. 534, el abuelo no podía adoptar individualmente debido a que estaba casado. Lo que procedía, dijimos, era la adopción conjunta de los abuelos. Ello, sin perjuicio de que la madre biológica mantuviera ciertas relaciones con su hija. Virella v. Proc. Esp. Reí. Fam., supra, pág. 760. En voz del entonces Juez Asociado Señor Corrada Del Río, expresamos:
En [M.J.C.A., menor v. J.L.E.M., menor] indicamos que nada impide que los tribunales, en casos particulares, conce-dan la adopción y opten por conceder la patria potestad a los abuelos paternos con la custodia compartida entre éstos y la madre biológica del menor .... Los tribunales, incluso, pueden considerar “otro tipo de relaciones con las condiciones que es-timen adecuadas y pertinentes”. Lo importante es que las al-ternativas sean analizadas por el tribunal “a base de los he-chos ante sí y del estudio social —mandatorio en estos casos— para optar por la alternativa que beneficie y sea mejor para el menor”. En fin, el tribunal deberá siempre determinar dónde residen los mejores intereses del menor y cuál debe ser el re-medio más adecuado: la adopción o las alternativas antes discutidas. (Citas y escolios omitidos, y énfasis en el original.) íd., págs. 760-761.
En Virella v. Proc. Esp. Reí. Fam., supra, entendimos que el mejor bienestar del menor estaba con sus abuelos. Por esa razón, estimamos que lo que procedía en ese caso era conceder la adopción a los abuelos, aun cuando la ma-dre biológica del menor deseaba retener la patria potestad y custodia legal de su hijo. Asimismo, favorecimos la adop- *921 ción del nieto por sus abuelos paternos, aun cuando ambos padres biológicos continuarían relacionándose con el menor.
La jurisprudencia reseñada demuestra nuestra fideli-dad al principio de que las normas sobre adopción deben ser interpretadas con el fin de garantizar el mejor bienes-tar del adoptado. Así, pues, hemos favorecido la flexibili-dad y desfavorecido las prohibiciones absolutas. De igual forma, hemos autorizado a los tribunales para considerar otras alternativas que puedan servir los mejores intereses del menor. Puesto que cada familia es un universo y este Tribunal no tiene la capacidad de anticipar todas las situa-ciones de hechos que pudieran suscitarse, nuestro rol en estos casos debe ser el de establecer guías que ayuden a los tribunales de instancia a llevar a cabo su encomienda de garantizarles un hogar estable a los menores que, por la razón que sea, no lo tienen.
Conforme a lo anterior, reiteramos que, en nuestro or-denamiento, no existe impedimento jurídico a que un as-cendiente adopte a un descendiente. De igual forma, reafir-mamos que unos abuelos pueden adoptar a su nieto, incluso cuando el menor mantendría contacto con sus padres biológicos. Cuando el mejor bienestar del menor esté con sus abuelos, y la madre biológica el padre biológico desee tener un rol activo en la crianza de su hijo, los tribu-nales podrán considerar cualquier otra alternativa que es-timen adecuada o pertinente, como, por ejemplo, conceder la patria potestad a los abuelos mediante la adopción, con la custodia compartida entre éstos y cualquiera de los padres biológicos del menor. Lo determinante en este proceso siempre debe ser dónde residen los mejores intereses del menor.
Con estos preceptos en mente, atendamos las particula-ridades de esta controversia.
*922 III
No existe controversia sobre la capacidad de los peticio-narios para garantizar el bienestar de su nieto. El Minis-terio Público y la Unidad de Adopciones del Departamento de la Familia coinciden en ello. El Tribunal de Primera Instancia no cuestionó esa determinación. Así, pues, las objeciones a esta petición son de carácter estrictamente jurídico. Por un lado, el tribunal de instancia denegó la adopción por entender que el propósito de la adopción es salvaguardar el bienestar de los menores maltratados, des-amparados, abandonados y sin hogar alguno, consideracio-nes que, según el foro primario, no están presentes en este caso. Por el otro, el Tribunal de Apelaciones confirmó tal dictamen fundamentado principalmente en que la adop-ción no desvincularía al menor de su madre biológica, lo cual, según ese foro, es contrario a la normativa vigente.
En los casos de adopción, nuestro norte siempre debe ser el bienestar del menor. Así como nuestra interpretación de la ley de adopción no debe ser tan liberal que viole la intención legislativa, tampoco puede ser tan estrecha que frustre su noble propósito de garantizarles un hogar esta-ble a los menores que no lo tienen. Si bien nuestra norma-tiva sobre adopción va dirigida a prestar atención particular a los menores maltratados, abandonados y desam-parados, de manera que estos tengan la oportunidad de criarse en un hogar donde puedan recibir la atención que se merecen, no sería justo entender que esa normativa atiende únicamente tales casos. Tal interpretación iría en detrimento del bienestar de muchos menores que, en el sentido más estricto, no son huérfanos ni han sido víctimas de maltrato o abandono. Conforme a lo anterior, la adop-ción debe también servir para atender la necesidad de ofre-cer hogares estables a menores cuyos progenitores no es-tán en condiciones de asumir la responsabilidad que supone ser padre o madre.
*923 Por otro lado, si bien la norma general es que la adopción desvincule al adoptado de todo vínculo de paren-tesco, hemos reconocido, a modo de excepción, la posibili-dad de que un tribunal conceda la adopción de un menor a sus abuelos sin desvincular totalmente al menor de su pa-rentela biológica. Virella v. Proc. Esp. Reí. Fam., supra; M.J.C.A., menor v. J.L.E.M., menor, supra. En todo mo-mento, nos referimos al vínculo jurídico que une al menor con su familia biológica, no al vínculo natural. Así, no po-demos suscribir una interpretación de la ley cuyo efecto práctico es supeditar la adopción de un nieto por sus abue-los al requisito de que la madre biológica del menor renun-cie a la posibilidad de relacionarse con su hijo. No vemos cómo una interpretación tan estricta propende al bienestar del menor. Tampoco vemos cómo abona a la política pública de que, en casos de adopción entre parientes, los menores continúen relacionándose con aquellos miembros de la fa-milia que son importantes para ellos. Art. 2(10) de la Carta de los Derechos del Niño, supra.
Como argumento adicional contra la presente petición, el Tribunal de Apelaciones señaló que permitir la adopción podría crear confusión en la psiquis del niño, elemento que, según ese foro, la trabajadora social no consideró en su estudio social. No estamos en posición de determinar si este elemento fue considerado o no por la trabajadora social. Sin embargo, se nos hace difícil pensar que esta profesional no haya considerado un aspecto tan evidente. Asimismo, no vemos cómo una adopción que vendría a for-malizar la relación doméstica ya existente entre los peti-cionarios y su nieto podría confundir a este último.
La teoría de que la presente adopción crearía una con-fusión en la psiquis del menor es, a lo sumo, una hipótesis. La realidad es que no estamos en posición de hacer tal determinación. Para ello, la ley ordena que, en casos como este, se haga un estudio social que los tribunales luego debemos considerar para determinar si la adopción sirve los mejores intereses del menor.
*924 No obstante lo anterior, entendemos que, llevado hasta sus últimas consecuencias, el razonamiento empleado por el Tribunal de Apelaciones nos requeriría intervenir con toda una serie de prácticas familiares. Con el pretexto de no confundir a los menores, no podríamos, por ejemplo, permitir que una madre con custodia de su hijo menor se case con un hombre distinto al padre de su hijo. ¿O es que ello no crea una confusión en la psiquis del menor?

En suma, no tenemos los elementos de juicio ni la pericia para evaluar el efecto que la adopción solicitada tendría sobre la psiquis del menor concernido. Así, pues, como me-jor garantizamos el bienestar del menor es dejando esa de-terminación a los especialistas en conducta humana.

De otra parte, el foro apelativo intermedio concluyó que el consentimiento de la madre biológica estuvo viciado toda vez que esta no quería o comprendía las consecuencias de la adopción, según se deduce de su alegada pretensión de continuar relacionándose con el menor. De la declaración surge que la madre biológica autorizó que su hijo fuera adoptado por sus abuelos “para todos los efectos legales”. La declaración no fue cuestionada. Además, de los hechos del casos se deduce que la madre biológica optó por desen-tenderse de su responsabilidad como madre. Como mí-nimo, esto ocurrió cuando, teniendo cinco años el menor, ella se fue del hogar de sus padres y dejó a su hijo viviendo con sus abuelos. Más aún, es posible que la madre bioló-gica, quien tenía apenas catorce años cuando su hijo nació, nunca asumiera tal responsabilidad. A esto se le suma el hecho de que, posteriormente, la madre biológica tuvo más hijos de otro padre, y en ningún momento ha procurado que el menor S.A.C. vaya a vivir con ellos. De lo anterior surge que la madre biológica consintió a que sus padres —los abuelos de S.A.C.— fueran quienes criaran a su hijo. Estamos, pues, ante una adopción que viene a convertir en realidad jurídica lo que hace años es una realidad “de facto”. Es decir, la adopción no trastoca la realidad domés-tica de la familia; por el contrario, la formaliza. En ese *925 contexto, la madre biológica no debió haber tenido dificul-tad en entender las consecuencias de la adopción.
Igualmente, ambos foros inferiores cuestionaron los mo-tivos de los peticionarios para querer adoptar a su nieto. Indicaron que el único fundamento para esta adopción es el beneficio económico por incapacidad que el peticionario y abuelo del menor, el señor Carrillo Vázquez, recibe de la Administración de Veteranos. Ese beneficio, sostuvieron, no puede ser el fundamento para conceder una adopción. Entendemos que la posibilidad de que el beneficio econó-mico sea de provecho para el menor no es, de por sí, un fundamento para conceder o denegar la petición de adopción. Ahora bien, no cabe duda de que este elemento puede ser considerado al analizar si la adopción solicitada contribuye al bienestar del menor. Así lo reconoció el legis-lador en la Ley Núm. 9 de 1995, supra, cuando indicó que mediante la agilización del proceso de adopción se perse-guía “el fin de que al adoptado se le provea, con carácter permanente, un hogar donde se le brinde cariño, cuidado, protección, seguridad económica, social y emocional”. (En-fasis suplido.) Exposición de Motivos de la Ley Núm. 9 de 19 de enero de 1995 (1995 (Parte 1) Leyes de Puerto Rico 61). No debe perderse de vista que, de ordinario, el factor económico incide en el acceso a los servicios dirigidos a alcanzar el desarrollo óptimo del menor, tales como la edu-cación y la salud.
Por último, debemos atender el planteamiento de los tribunales inferiores en el sentido de que lo que procedía en este caso era que los abuelos solicitaran la custodia de su nieto. Es correcto que los peticionarios tenían esa alter-nativa, mas no era la única que tenían. Como hemos visto, en nuestro ordenamiento no existe impedimento a que unos abuelos adopten a su nieto, incluso cuando, como en este caso, la madre biológica continuaría relacionándose con el menor. Así, pues, recae sobre las partes concernidas la determinación inicial de qué arreglo jurídico-familiar es *926 el más apropiado para garantizar los mejores intereses del menor. Esa determinación inicial luego deberá ser avalada por un tribunal. Este verificará que la adopción solicitada cumpla con los requisitos de ley y evaluará la petición a la luz criterios establecidos para ello.
La custodia no tiene los mismos efectos jurídicos que la patria potestad adquirida por la adopción. Con solo la cus-todia, los abuelos no podrían, por ejemplo, suplir la capa-cidad de su nieto menor. Para ello, tendrían que obtener la tutela. Tal trámite sería una carga adicional a los abuelos toda vez que, como tutores, tendrían que cumplir con toda una serie de requerimientos que nuestra normativa sobre la tutela impone. Por otro lado, mediante la adopción, los abuelos obtendrían la custodia permanente del menor. Diferente sería el caso si tuvieran solo la custodia. En tales circunstancias, los abuelos quedarían a la merced de que, en un futuro incierto, la madre o el padre biológicos solici-ten la custodia del menor. Resulta evidente que, en este caso, tal eventualidad daría al traste con la estabilidad y seguridad de las que el menor S.A.C. goza actualmente junto a sus figuras paternas de facto, sus abuelos. Solo la adopción garantizaría el disfrute ininterrumpido de esas condiciones, amén de que formalizaría la responsabilidad parental que los abuelos han asumido respecto a su nieto.
En suma, coincidimos con la apreciación de que quienes mejor pueden garantizar el bienestar del menor S.A.C. son los peticionarios. Asimismo, estimamos que, en las circuns-tancias específicas de este caso, la adopción es el meca-nismo jurídico que mayor protección ofrece los mejores in-tereses del menor. Por estas razones, y convencidos de que no existe ningún impedimento jurídico a la adopción solici-tada, hubiéramos revocado la sentencia del Tribunal de Apelaciones.

 Al momento de presentarse esta petición de adopción, la señora Carrillo Colón, madre biológica del menor, tenía tres hijos adicionales y se encontraba a la espera de un quinto hijo. Excepto por el menor S.A.C., todos los otros hijos de la señora Carrillo Colón viven con ella y su compañero sentimental. Para esa misma fecha, el presunto padre biológico del menor se hallaba confinado.

 Como cuestión de hecho, a la fecha de presentación de la petición, los peti-cionarios, el Sr. Samuel Carrillo Vázquez y la Sra. Ana I. Colón Ortiz, tenían 56 y 44 años, respectivamente.

 Allí, la Sra. Gloria Ileana Carrillo Colón declaró: “Que por la presente libre y voluntariamente AUTORIZO Y NO TENGO OBJECIÓN a que mi hijo se[a] ADOP-TADO LEGALMENTE POR SUS ABUELOS SAMUEL CARRILLO VÁZQUEZ Y ANA LILIAM COLÓN ORTIZ para todos los efectos legales”. Apéndice del Recurso de certiorari, pág. 17.

 De la resolución emitida a tales efectos por el foro de instancia, resultan relevantes las expresiones siguientes:
“Tomamos excepción de las expresiones de la parte peticionaria al inferir una veda particular a las peticiones de adopción promovidas por abuelos. Ciertamente esa no es la postura de este Tribunal, según evidencia nuestro récord judicial en atención de solicitudes instadas por abuelos y familiares, en circunstancias que se enmarcan dentro del fin perseguido por la normativa de adopción.” Apéndice del Recurso de certiorari, pág. 44.

 U.S. Census Bureau, Datos de la Encuesta sobre la Comunidad de Puerto Rico de 2005-2009 (Características Generales: Población y Vivienda), disponible a través de http://factfinder.census.gov/servlet/BasicFactsServlet? — lang=es—ts=.

 Oficina de Planificación de ADFAN, Informe Estadístico SP 412 (Informe de Adopción). En el año fiscal 2008-2009,16.9% de los menores adoptados en el País (52 de 307) fueron adoptados por sus abuelos; en el 2007-2008, 24.3% (69 de 292); en el 2006-2007, 18.8% (61 de 325); en el 2005-2006, 17.8% (62 de 349). íd.

 El Art. 130 del Código Civil, 31 L.P.R.A. see. 531, dispone:
“El adoptante, a la fecha de la presentación de la petición de adopción, deberá cumplir con los siguientes requisitos:
“(1) Haber residido ininterrumpidamente en Puerto Rico por lo menos durante los seis (6) meses anteriores a la fecha de la petición de adopción.
“(2) Haber alcanzado la mayoría de edad, excepto en el caso en que dos (2) personas unidas en matrimonio adopten conjuntamente, en cuyo caso bastará que uno de ellos sea mayor de edad, pudiendo ser menor de edad el otro adoptante pero nunca menor de dieciocho (18) años.
“(3) Tener capacidad jurídica para actuar.
“(4) Tener por lo menos catorce (14) años más que el adoptado menor de edad.
“En los casos en que un cónyuge desee adoptar un hijo del otro cónyuge, bastará que a la fecha de la presentación de la petición el adoptante tenga por lo menos dos (2) años de casado con el padre o madre del adoptado o que el cónyuge adoptante tenga por lo menos catorce (14) años más que el adoptado menor de edad.”
Por su parte, el Art. 131 (31 L.P.R.A. see. 532), dispone:
“No podrán ser adoptantes las personas declaradas incapaces por decreto judicial mientras dure la incapacidad. En el caso de una persona sentenciada a cumplir pena de reclusión, no podrá ser adoptante mientras dure la misma.”