Opinión disidente emitida por el
Juez Asociado Señor Es-trella Martínez.
Disiento. Hoy se aplica erróneamente un artículo del Código Civil que no contempla ni prohíbe la petición de adopción de la presente causa. Hoy se articula un gesto a medio camino entre la realidad y el derecho, y en el acto se priva de protección a la niña, sin muestras de reparar en su mejor bienestar y conveniencia. Pero hoy, la mirada quedó fija en el adulto, y el olvido impreso en la menor.
r-H
Desde 1988, AAR y CW han mantenido una relación sentimental de convivencia estable, que ha continuado sin interrupción hasta el presente.(1) Ambas han alcanzado grados doctorales en el área de conducta humana y tienen vasta experiencia profesional con menores. En 1995, la pa-reja comenzó a considerar la idea de la crianza de un hijo o de una hija. Juntas decidieron que CW, por ser más joven que AAR, se sometería a un proceso de inseminación intrauterina. Luego de cavilar por mucho tiempo cuál sería la fuente de inseminación y el mejor momento para ello, ambas contactaron a un donante anónimo de espermato-zoides en Estados Unidos, cuya identidad no sería del todo desconocida. Esto le permitió a AAR y a CW conocer datos del historial familiar y de salud del donante, porque enten-dían que tal información podía ser necesaria para la salud *1072 del bebé en algún momento. El acuerdo para la donación de espermatozoides se formalizó mediante un contrato creado por el propio donante, quien no tiene interés en ser algo más que eso.(2)
CW quedó embarazada en el cuarto intento de inseminación. La pareja participó activamente de los even-tos asociados al embarazo. Juntas asistieron a cuidados prenatales y a clases preparto. El 17 de julio de 2000, día en que nació la niña, AAR acompañó a su pareja en todo el proceso del parto y fue la primera persona que la menor JMAV vio al nacer.(3)
En ese momento, ya todo estaba listo en el hogar para recibir a la niña: su habitación, su ropa y sus juguetes, entre otros. Como la menor no podía ser lactada, la pareja compartió de manera equitativa el proceso de nutrición de JMAV. En las noches, AAR la alimentaba y en el día CW, quien se acogió a licencia por maternidad y vacaciones. Más adelante, al no encontrar un lugar con el que se sin-tieran seguras para el cuidado de la menor, consideraron opciones con la familia extendida de ambas. La búsqueda fue fructífera. La abuela de la menor por parte de CW se mudó a la casa, de lunes a viernes, para cuidar de la niña.
AAR contribuye económicamente al sostenimiento de JMAV, participa de todas las decisiones en torno a su edu-cación, salud y bienestar. Es considerada por sus colegas como una persona especialmente virtuosa, competente y experta.(4) AAR y CW han compartido a plenitud todas las responsabilidades y decisiones de la crianza. La pareja se alterna la responsabilidad de llevar y buscar a la niña a la escuela, asistir a reuniones con las maestras, llevarla al pediatra y a otras actividades extracurriculares. Ambas se presentan y son consideradas en igualdad de condiciones *1073 ante la directiva, los compañeros de la escuela y la socie-dad en general.(5) Pasan los fines de semana juntas, reali-zan actividades educativas, van a conciertos y viajan. Los familiares y las amistades de la pareja conocen, apoyan y participan de este núcleo familiar.
AAR y CW se asesoran sobre nuevas áreas y alternati-vas para la crianza de la niña, y utilizan recursos literarios para orientarse al respecto.(6) Sus patrones de comunica-ción se caracterizan por ser abiertos, sinceros e igualita-rios, e incluyen el respeto y la tolerancia hacia puntos de vista distintos.(7)
La menor JMAV habla de manera espontánea sobre su familia y reconoce en AAR y CW el vínculo de madres.(8) La niña “observa su organización familiar como normal y típica, sin sesgo de sentirse rara o particular”.(9) Sus maes-tras la describen como cooperadora, creativa y atenta. Asiste a la escuela limpia y ordenada, con sus tareas rea-lizadas y sus materiales organizados.(10) Además, tiene dis-posición para el aprendizaje y demuestra excelentes habi-lidades de asociación y análisis.(11) La menor tiene un cociente de inteligencia global muy superior en compara-ción a su grupo normativo.(12) También demuestra un fun-cionamiento sobresaliente en la escala verbal y en la de ejecución, en las habilidades para el razonamiento lógico y abstracto, en el razonamiento aritmético, en el conoci-miento general y en la memoria remota. De igual forma, el *1074 juicio social, el control de la atención y la concentración están a un nivel superior.(13)
La niña tiene una percepción adecuada de sí y de su entorno social. No hay evidencia de indicadores emociona-les que interfieran con su desarrollo.(14) JMAV se conduce de forma educada, respetuosa y cariñosa.(15) Se siente amada y responde afectivamente a su familia extendida. Demuestra un nivel de madurez más avanzada de lo espe-rado para su edad. Del mismo modo, goza de actividades que cultivan sus talentos y vive una rutina diaria que ase-gura su bienestar, el buen cuido y su formación.(16)
La pareja decidió que AAR debía adoptar a JMAV para brindarle la misma protección legal que gozan otros niños y niñas. En 2005, AAR presentó una petición de adopción ante el Tribunal de Primera Instancia, en la cual solicitó adoptar a JMAV sin que ello tuviera el efecto de romper el vínculo filial entre la menor y CW Esta última consintió a la adopción y desea mantener el referido vínculo jurídico. AAR argumentó ante el tribunal la aplicación a la presente causa de la doctrina de adopción sucesiva, conocida como Second Parent Adoption.
Luego de varios trámites procesales, el Tribunal de Pri-mera Instancia celebró una vista en la cual se presentó evidencia sobre la petición de adopción. Hubo abundante prueba pericial e informes sociales y psicológicos que de-mostraron que la adopción solicitada respondía al mejor bienestar y conveniencia de la menor.
La Dra. Carol M. Romey, psicóloga Clínica, concluyó en su informe que “[l]os hallazgos del proceso evaluativo no identifican riesgo alguno ni área de vulnerabilidad de [JMAV] continuar viviendo en su hogar, el cual está cons- *1075 tituido por dos madres. Este es el hogar seguro en el cual [JMAV ha vivido] desde el momento de su concepción y nacimiento”.(17) Entre otras cosas, la doctora concluyó que era su opinión como examinadora forense, “y sin reserva alguna, que [AAR] está totalmente preparada para ser la madre adoptativa de [JMAV]” y que la menor “está total-mente preparada psicológica y socialmente para ser adoptada”.(18) (Enfasis en el original).
Por su parte, la Dra. Carmen Delia Sánchez, trabaja-dora social, expresó en su informe sobre evaluación social que “no existe evidencia alguna de factores que puedan ser perjudiciales o pongan en riesgo el bienestar de la niña. Es manifiesto que la maternidad en este caso particular fue una planificación pensada, lo cual demuestra que JMAV fue una niña deseada por la pareja”.(19) Según la doctora, “[e]sto contrasta con la realidad de la mayor parte de los niños y niñas en Puerto Rico en donde solo una tercera parte (1/3) de los embarazos son planificados”.(20) La doc-tora recomendó favorablemente que AAR fuera una se-gunda madre adoptiva y, como experta en conducta hu-mana, sostuvo que ello respondía al mejor bienestar e interés de la niña.
Posteriormente, el Tribunal de Primera Instancia emi-tió una sentencia mediante la cual declaró “no ha lugar” la petición de adopción. El foro primario reconoció tener dis-creción judicial para resolver situaciones que no estuvieran reguladas específicamente por el estatuto. Sin embargo, entendió que el Art. 138 del Código Civil, 31 L.P.R.A. sec. 539, prohibía este tipo de adopción.(21) Este dictamen fue *1076 confirmado por el Tribunal de Apelaciones y hoy ha sido avalado por una mayoría de este Tribunal.
Lamentablemente, las decisiones de los foros a quo y la de este Tribunal comparten tres elementos en común: (1) aplican erróneamente un artículo del Código Civil que no contempla ni regula la petición de adopción de la presente causa; (2) interpretan que ese artículo, evidentemente pre-dicado para otros supuestos de adopción, prohíbe que la menor JMAV pueda ser adoptada por AAR, y (3) no han considerado el mejor bienestar y conveniencia de la menor.
HH b-H
La política pública en materia de adopción es lograr el mejor bienestar del menor. Ese es el propósito primordial del procedimiento de adopción que nunca debe ser sacrificado. Por ello, ante toda consideración, la decisión de autorizar una adopción descansa principalmente en la con-veniencia y bienestar del menor. Zapata et al. v. Zapata et al., 156 D.P.R. 278, 287 (2002); Virella v. Proc. Esp. Rel. Fam., 154 D.P.R. 742, 754 (2001).
Es conocido que los tribunales tenemos discreción para resolver casos de adopción, teniendo siempre como guía para nuestra decisión el bienestar y la conveniencia del menor. 31 L.P.R.A. sec. 534. Ese bienestar como criterio rector no puede tomarse de forma liviana, pues incide sig-nificativamente en el ejercicio de nuestra discreción, al grado que requiere que las disposiciones sobre adopción sean interpretadas liberalmente a favor del niño o la niña que será adoptado. Virella v. Proc. Esp. Rel. Fam., supra, pág. 756.
En Puerto Rico la adopción se rige, en su vertiente sus-tantiva, por la Ley Núm. 8-1995, la cual enmendó el Có-digo Civil con el fin público de proteger y procurar el bien-estar de los menores, a través de un hogar donde pudieran desarrollarse física y emocionalmente. 31 L.P.R.A. sees. *1077 531 — 539. En su vertiente procesal, la adopción se rige por la Ley Núm. 9-1995, la cual enmendó las disposiciones del Código de Enjuiciamiento Civil. 32 L.P.R.A. sees. 2699-2699t. Esta ley tiene el propósito de brindarle a los meno-res la oportunidad de formar parte de hogares estables, donde puedan encontrar la felicidad, el amor, la protección y el desarrollo físico, psicológico y mental.
En conjunto, estas enmiendas responden al interés del Estado de flexibilizar los procedimientos de adopción, de manera que más niños y niñas puedan beneficiarse de ésta. El historial legislativo de estas medidas refleja clara-mente que lo más importante en materia de adopción es el bienestar y la conveniencia del menor. Art. 140, P. del S. 944 de 16 de noviembre de 1994, 12ma Asamblea Legisla-tiva, 6ta Sesión Ordinaria, pág. 10; Art. 140, P. de la C. 1607 de 17 de noviembre de 1994, 12ma Asamblea Legis-lativa, 6ta Sesión Ordinaria, págs. 12-13; Diario de Sesio-nes de la Cámara de Representantes, 8 de diciembre de 1994; Diario de Sesiones del Senado, 16 de diciembre de 1994; Informe de la Comisión de lo Jurídico del Senado sobre el P. de la C. 1607 de 15 de diciembre de 1994; In-forme de la Comisión de lo Jurídico Civil de la Cámara de Representantes sobre el P. de la C. 1607, pág. 13.
El bienestar del menor es tan primordial para la legis-lación, que el mencionado historial legislativo no recoge la más mínima intranquilidad respecto a la subsistencia del vínculo entre el adoptado y su padre biológico o madre bio-lógica de la familia anterior, si ello redunda en el bienestar del menor a ser adoptado. La Exposición de Motivos de la Ley Núm. 8-1995 (1995 (Parte 1) Leyes de Puerto Rico 45) es una muestra del sitial que ocupa el aludido criterio en nuestro ordenamiento jurídico, al consignar expresamente que “[e]s política pública e interés apremiante del Estado promover el bienestar y el mejor interés de los menores”. Id., pág. 46. A fin de cuentas, lo primordial en materia de adopción es darle a los menores la oportunidad de criarse *1078 en un hogar donde puedan ser atendidos debidamente. López v. E.L.A., 165 D.P.R. 280, 300 (2005); M.J.C.A., menor v. J.L.E.M., menor, 124 D.P.R. 910 (1989).
Cabe señalar que recientemente se aprobó la Ley de Re-forma Integral de Procedimientos de Adopción de 2009, Ley Núm. 186-2009 (32 L.P.R.A. secs. 2699-2699t), la cual alberga entre sus propósitos “facilitar en la forma más liberal” los procedimientos de adopción y “simplificar y libe-ralizar sustancialmente los requisitos de ley para la emi-sión de decretos de adopción”. 32 L.P.R.A. sec. 2699. Además, la declaración de política pública de esta ley reco-noce la importancia de los informes periciales, “para que los tribunales puedan ejercer su poder de parens patriae, en la búsqueda del bienestar y conveniencia del [adoptado]”. íd. Igualmente, la Ley Núm. 186-2009 enfa-tiza la autoridad de los tribunales para decidir causas de adopción, según las circunstancias particulares de cada caso. Id. Más recientemente esta ley fue enmendada por la Ley Núm. 248-2012, la cual reconoce en su exposición de motivos que los menores son “los sujetos jurídicos más vul-nerables en nuestra sociedad”, por lo que se debe salva-guardar su bienestar. (22) En cuanto a la adopción, esta ley establece de forma diáfana que “[t]odos estos procesos es-tarán siempre enmarcados en el mejor bienestar de los me-nores y es precisamente en ese aspecto que los jueces de-berán basar y tomar sus decisiones”.(23) Id.
El Art. 137 del Código Civil, 31 L.P.R.A. sec. 538, dis-pone que el decreto final y firme de adopción extingue “todo vínculo jurídico entre el adoptado y su familia bioló-gica o adoptativa anterior”. Sin embargo, ya en el pasado hemos empleado la discreción conferida para resolver favo- *1079 rablemente peticiones de adopción, cuando ello responde al mejor bienestar del menor. Así, en Ex parte J.A.A., 104 D.P.R. 551 (1976), resolvimos que una persona puede adop-tar individualmente a la hija de su pareja sentimental, sin que la menor pierda el vínculo en su parentesco natural con su padre biológico. Todo depende del mejor bienestar del menor, y no de otras consideraciones ajenas a ese bienestar. En aquel entonces interpretamos las disposicio-nes de la ley para validar una adopción que no estaba con-templada en ella —que una persona soltera adoptara a un menor y éste mantuviera su relación ñliatoria con su padre biológico— con el fin de adelantar el propósito del estatuto: el bienestar del menor. Del mismo modo, sostuvimos, en una oración cargada de sentido, que “[l]a adopción por la peticionaria [venía] a consagrar ante la ley la situación de hechos que la niña [había] conocido durante toda su corta vida”. Id., pág. 560. Emitimos estas expresiones en 1976. Desde entonces, el tiempo ha discurrido y han sido muchos los cambios sociales y científicos que conforman nuestra realidad actual.
Hoy nos enfrentamos a una situación fáctica parecida a la de aquella ocasión, con la diferencia de que la persona que solicita la adopción es del mismo sexo que la madre biológica de la menor. Pero ante todo, con la gran diferen-cia de que la niña nació producto de la voluntad combinada de CW y de AAR, quien desde las etapas de planificación para la concepción de JMAV, durante su nacimiento y hasta hoy, también ha sido de facto madre de la menor. Nuevamente tenemos el deber de consagrar ante la ley la situación de hechos planificada que JMAV ha conocido du-rante toda su vida.
I — I I — I
Es un principio cardinal de la hermenéutica legal que “[c]uando la ley es clara [y] libre de toda ambigüedad, la *1080 letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu”. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Véanse, también: Sánchez Díaz et al. v. E.L.A., 181 D.P.R. 810, 821 (2011); Bomberos Unidos v. Cuerpo de Bomberos et al., 180 D.P.R. 723, 750 (2011); Alonso García v. S.L.G., 155 D.P.R. 91, 98 (2001).
En aras de brindarle contenido a esta norma de exégesis jurídica, hemos establecido que “el primer paso al interpre-tar un estatuto es remitirnos al propio texto de la ley, puesto que cuando el legislador se ha expresado en un len-guaje claro e inequívoco, el propio texto de la ley es la ex-presión por excelencia de la intención legislativa”. Cordero et al. v. ARPe et al., 187 D.P.R. 445, 456 (2012). Véase, también, Mundo Ríos v. CEE et al., 187 D.P.R. 200 (2012). A esos efectos, hemos sido claros en añadir que en aquellos casos en los cuales “el lenguaje de la ley no cree dudas, no es necesario ir más allá de la letra de ésta para hallar la voluntad del legislador, sino que se debe descubrir y dar efecto a la intención según expresada en la propia letra del estatuto”. Cordero et al. v. ARPe et al., supra, pág. 456.
En ese proceso de ceñirnos al texto de un estatuto a la hora de interpretarlo, resulta imprescindible entender los términos y las palabras empleadas en él. Este esfuerzo exi-girá que las palabras de una ley sean interpretadas, en primer plano, según las definiciones que del propio estatuto. Sánchez Díaz v. E.L.A., supra, pág. 824-825. En ausencia de una definición intrínseca, el Código Civil nos ilustra que “[l]as palabras de una ley deben ser general-mente entendidas en su más corriente y usual significa-ción”, prestando atención “al uso general y popular de las voces”. Art. 15 del Código Civil de P.R., 31 L.P.R.A. sec. 15. En aras de cumplir con lo anterior, la doctrina ha provisto que, regularmente, el diccionario constituirá “la fuente más confiable para determinar el significado de una pala-bra, pues se presume que el legislador lo ha utilizado”. R.E. Bernier y J.A Cuevas Segarra, Aprobación e interpretación *1081 de las leyes en Puerto Rico, 2da ed., San Juan, Pubs. JTS, pág. 250, 1987. Véase, también, Castillo v. Depto. del Trabajo, 152 D.P.R. 91, 101-102 (2000).
Ahora bien, será preciso tener presente que el uso del diccionario por parte del legislador es solo una presunción. Bernier y Cuevas Segarra, op. cit., pág. 251. Ante ello, “si surge por otro lado que el legislador quiso usar determi-nada palabra o frase queriendo decir algo distinto a lo que señala el diccionario, debe prevalecer este significado sobre la definición del diccionario, pues eso fue lo que el legisla-dor quiso expresar”. íd. Ello se debe a que una interpreta-ción literal de un estatuto no puede llevar “a un resultado absurdo o contrario a la verdadera intención o al verdadero propósito del legislador”. Báez Rodríguez et al. v. E.L.A., 179 D.P.R. 231, 245 (2010).
Es solo ante tal coyuntura que el Tribunal podrá recu-rrir a fuentes extrínsecas al texto de la ley, como lo son su exposición de motivos, los informes de las comisiones y los debates en el hemiciclo (Pérez v. Mun. de Lares, 155 D.P.R. 697, 706 (2001)), con el fin de identificar “los objetivos del legislador, las realidades sociales que motivaron el esta-tuto [y] el modo en que, en una sociedad cambiante, pue-den cumplirse mejor los valores que la ley entraña”. Ber-nier y Cuevas Segarra, op. cit., pág. 251.
En el caso de marras, el Art. 138 del Código Civil, supra, es la disposición en torno a la cual una mayoría de este Tribunal ordena su decisión. En lo aquí pertinente, el Art. 138 dispone lo siguiente:

Subsistencia del vínculo con la familia anterior

No obstante lo dispuesto en la see. 538 de este título, los vínculos jurídicos del adoptado con su familia paterna o ma-terna anterior subsistirán cuando el adoptado sea hijo del cón-yuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, o cuando el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al del padre o la madre que lo ha reconocido como su hijo.
La ruptura y extinción de los vínculos jurídicos con la fami- *1082 lia anterior del adoptado, y el nacimiento de tales vínculos con la familia del adoptante, se entenderán sin perjuicio de la re-glamentación sobre prohibiciones de ley para contraer matri-monio en Puerto Rico. Un adoptado no podrá contraer matri-monio con un pariente de su anterior familia, en los mismos casos en que no hubiere podido contraerlo de no haber ocu-rrido la adopción. (Subrayado nuestro). íd.
Como puede apreciarse, el texto del primer párrafo del Art. 138, supra, atiende aquellas circunstancias en las cua-les habrán de subsistir los vínculos jurídicos de un adop-tado con su familia paterna o materna anterior. El legisla-dor, al redactar el referido articulado y proveer para tales circunstancias, estructuró un marco analítico compuesto de tres elementos: una exigencia de umbral y dos supues-tos jurídicos íntimamente atados a tal requisito.
En primer plano, la exigencia de umbral que habrá de quedar satisfecha previo a considerar la aplicabilidad del Art. 138, supra, lo constituye la existencia de una familia anterior. El texto claro del Art. 138, supra, nos especifica que su ámbito de aplicación se circunscribe únicamente a aquellas controversias legales que involucren a un adop-tado que procede de una familia paterna o materna anterior. Una vez se configura este requisito esencial, en-tonces, y solo entonces, es que el legislador autoriza la con-sideración de los dos supuestos jurídicos que configura el Art. 138, supra, a saber: (1) la subsistencia de los vínculos jurídicos del adoptado con su padre o madre biológica, cuando es adoptado por el cónyuge de éste o ésta, y (2) la subsistencia de los vínculos jurídicos del adoptado con su padre o madre biológica, cuando el adoptado procede de una única filiación y es adoptado por una persona de dife-rente sexo al de su padre o madre biológica.
En cambio, cuando un adoptado no procede de una fa-milia anterior, el Art. 138, supra, no aplicará. Ello se debe a que el texto del referido articulado nada dice sobre aque-llas situaciones fácticas que atañen a los adoptados que no provienen de una familia anterior, en las cuales quien so- *1083 licita la adopción es un padre o una madre funcional que siempre ha formado parte de la familia original del menor. Como resultado, ante la ausencia de este requisito primordial, no se justifica contemplar los dos supuestos jurídicos esbozados por este articulado. Ello, pues el único interés sujeto a su ámbito de aplicación son los adoptados que pro-vienen de familias anteriores.
A la luz del análisis señalado, lo determinante respecto a la aplicabilidad o no del Art. 138, supra, siempre será la presencia o ausencia de una familia anterior. Si la situa-ción fáctica analizada por un Tribunal configura la existen-cia de una familia anterior, entonces cabe hablar sobre la aplicabilidad del Art. 138, supra. De otra parte, cuando las circunstancias de una controversia no presentan tal ele-mento, resulta forzoso concluir que el juzgador no viene llamado a aplicar el estatuto bajo examen a los hechos que tiene ante su consideración. Entiendo que esa es la norma que debe prevalecer al momento de analizar cualquier con-troversia que implique el Art. 138, supra. Urge entonces que definamos el concepto familia anterior para así cono-cer cuándo habrá de activarse el ámbito de aplicación del nombrado articulado.
Según lo discutido, los términos contenidos en un texto legislativo se definirán primero, según la definición intrín-seca del estatuto bajo análisis. En el caso de marras, el Código Civil y la Ley Núm. 8-1995 no definen la frase fa-milia anterior. Como resultado, nos vemos obligados a de-finir el concepto según su significado más corriente y usual, valiéndonos de los diccionarios en todo aquello que no sea incompatible con los propósitos perseguidos por el legislador al redactar el Art. 138, supra.
La frase familia anterior es de naturaleza compuesta. Su primer componente, la voz familia, denota a un “grupo de personas emparentadas entre sí que viven juntas”.(24) *1084 (Énfasis suplido). A su vez, la voz anterior significa aquello “que precede en lugar y tiempo”.(25) Al unir ambos concep-tos, podemos conocer que el legislador, al utilizar la frase familia anterior en el Art. 138, supra, vislumbraba aquel supuesto fáctico en el cual existe un grupo de personas distinto e independiente al grupo de personas que ahora persigue entablar una filiación adoptiva con el menor, el cual se relacionaba y vivía junto al adoptado con anticipa-ción a su nueva familia adoptiva. Concretamente, la refe-rida frase, según es empleada en el estatuto, persigue atender aquellos vínculos jurídicos o biológicos que antece-den a la filiación adoptiva que se persigue crear, los cuales configuraban una relación de convivencia entre el menor y ese grupo de personas distinto a los individuos que ahora buscan conformar un nuevo hogar adoptivo.
Nada se dice sobre los nuevos modelos neoparentales en los que la madre o el padre funcional planificaron conjun-tamente con la madre o el padre biológico la procreación de una criatura, la cual tuvo desde siempre y continuamente como su familia a ambos padres o madres. Esta realidad no fue contemplada, y mucho menos prohibida, por el legisla-dor al redactar el estatuto bajo examen.
La definición que hoy ofrecemos de la frase familia anterior, según ésta ha sido empleada en el Art. 138, supra, no tan solo se ciñe fielmente al texto claro y no ambiguo del referido estatuto, sino que es cónsona con los propósitos perseguidos por el legislador al promulgar el articulado bajo examen. Según se desprende del historial legislativo de la pieza legislativa que nos ocupa, este artículo persigue ofrecer un nuevo hogar a los menores que son “abandona-dos”, “maltratados” y “desamparados” por una familia previa.(26) Véase Exposición de Motivos de la Ley Núm. *1085 8-1995, supra. Según esta exposición de motivos, que mo-dificó el Art. 138, supra, el grupo focal que considera éste son esos menores abandonados y desamparados por una familia, o por el padre biológico o la madre biológica, que muy en particular son anteriores a la nueva familia o persona que adoptará al menor, para que en esta ocasión éste pueda disfrutar de un hogar estable en el cual pueda desa-rrollarse como individuo.
Según la Exposición de Motivos de la Ley Núm. 8-1995, supra, el Art. 138 del Código Civil, supra, está predicado para el supuesto histórico y tradicional de adopción, en el cual una familia anterior abandona, maltrata o deja des-amparado al menor, de manera tal que la adopción consti-tuye la alternativa para brindarle una nueva familia, que sea estable, a ese menor. Véanse: Exposición de Motivos de la Ley Núm. 8-1995, supra; Exposición de Motivos de la Ley Núm. 9-1995 (1995 (Parte 1) Leyes de Puerto Rico 60). Pero más importante aún, el Art. 138, supra, solo contem-pla y regula el supuesto de subsistencia de vínculos cuando el adoptado proviene de una pasada familia. Muestra de ello es que tal disposición presupone, sin más, la existencia de un vínculo con una familia que tiene que ser anterior, pero desconoce la realidad de que el adoptado no siempre ha de ser de una familia anterior, sino que puede serlo de su propia familia: la de siempre, la que planificó su concep-ción, la que el menor tuvo durante su nacimiento y la que ha conformado su realidad hasta el presente. En otras pa-labras, hay situaciones en las que no cabe hablar de que el menor proviene de una familia anterior y que con la adop-ción pasará a formar parte de una familia posterior.
En ese tenor, es evidente que el Art. 138 del Código Civil, supra, no aplica a casos como el de marras. Ello, pues el referido articulado no contempla ni regula los vínculos *1086 que surgen luego de una inseminación intrauterina para la reproducción asistida, los cuales, de ordinario, se determi-nan por la intención original de las partes. En específico, el legislador, al promulgar el Art. 138, supra, no vislumbró que mediante los métodos noveles de la reproducción asis-tida y los nuevos modelos neoparentales, un adoptado puede carecer de una familia anterior, por causa de que tales métodos han permitido el nacimiento del adoptado en un núcleo familiar original el de siempre compuesto por procreadores biológicos o padres o madres funcionales. Al no configurarse una familia anterior en tales casos, no se cumple con el requisito de umbral exigido por el legislador al estructurar el marco de aplicabilidad del Art. 138, supra. Consecuentemente, no cabe hablar sobre las restric-ciones o limitaciones impuestas por los dos supuestos jurí-dicos configurados en el artículo citado, incluyendo la pro-hibición de la adopción por una persona del mismo sexo del padre o la madre biológica del adoptado.
Según la ley y su historial legislativo, lo único que pre-vio e intentó regular el legislador con el Art. 138, supra, fue el supuesto tradicional de adopción, que a su vez solo en-tendía del método de reproducción tradicional como medio para conformar una familia, y requería necesariamente de la existencia de una familia anterior. Pero los recientes adelantos en la medicina reproductiva han posibilitado el surgimiento de familias en las que la conexión biológica o genética ya no es el único principio para la organización familiar.
Las técnicas de reproducción humana asistida admiten la participación voluntaria de terceras personas, que por la voluntad de otra u otras, aportan todo o parte del material genético para la procreación de un hijo o hija, que no será del donante, sino de quienes decidieron por ese medio te-ner al menor. Estas tecnologías permiten la fecundación intracorpórea y extracorpórea, y contienen múltiples méto-dos particulares para la fecundación, por ejemplo: la inse-minación intrauterina; la fertilización in vitro y sus deri- *1087 vados; la inseminación o fertilización in vitro homologa; la inseminación o fertilización in vitro heteróloga, a través de un tercero que puede ser conocido o anónimo y que sirve de donante, y la maternidad por encargo, suplente, sustituta o subrogada. K.S. Knaplund, Children of Assisted Reproduction, 45 U. Mich. J.L. Reform 899 (2012); L. Bennett Moses, Understanding Legal Responses to Technological Change: the Example of In Vitro Fertilization, 6 Minn. J.L. Sci. & Tech. 505 (2005).(27)
En el pasado era imposible desprender el hecho de la gestación y el parto del hecho de la concepción. También era impensable para propósitos de los vínculos de filiación natural desprender el hecho de la gestación del material genético particular de los individuos que formarían la fa-milia inmediata del menor. Pero hoy la realidad es distinta.
Lamentablemente, en Puerto Rico nos encontramos des-provistos de legislación que rija las consecuencias jurídicas de estos avances científicos, los cuales redefinen y presen-tan un desafío a la norma tradicional en materia de rela-ciones de familia. Conscientes de la ausencia de legislación al respecto, en el pasado la Asamblea Legislativa realizó esfuerzos para llenar ese vacío jurídico y atemperar, en general, nuestro ordenamiento jurídico civil a la realidad de los tiempos. En 1997 se aprobó la Ley Núm. 85-1997 (2 L.P.R.A. sec. 141 et seq.), la cual creó la Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil de Puerto Rico de 1930, con el propósito de realizar una revisión total y una reforma del Código Civil para actuali-zar las normas allí contenidas a la realidad actual.(28)
La mencionada comisión preparó un borrador para la discusión del Código Civil en el que se propuso regular por *1088 primera vez en Puerto Rico los vínculos jurídicos que sur-gieran de los avances en las tecnologías de reproducción humana. Ese trabajo contemplaba supuestos noveles en la procreación asistida, en los cuales los vínculos filiatorios podían determinarse por la intención original de las partes. En particular, se propuso regular por primera vez: el acuerdo sobre donación de gametos (óvulos y espermato-zoides) y donación de embriones; los efectos de ese tipo de donación en cuanto a los vínculos jurídicos entre el do-nante y la prole así procreada, y entre el o la donante y la persona gestante o recipiente del material genético; la ma-ternidad subrogada —como la gestación de un hijo a peti-ción de otra persona— y, con el beneficio de la regulación de los asuntos que preceden, la subsistencia de los vínculos jurídicos del adoptado, entre otros. Véase Comisión Con-junta Permanente para la Revisión y Reforma del Código Civil de Puerto Rico, Borrador para discusión del Código Civil de Puerto Rico, Libro Segundo, Las Instituciones Fa-miliares, Memorial Explicativo, Tomo II, 11 de enero de 2007, San Juan, Puerto Rico.
No obstante lo anterior, las propuestas para atemperar el Código Civil a la realidad actual no han sido adoptadas o rechazadas formalmente por la Asamblea Legislativa. En-tretanto, un sector de la población —que sobre todo incluye a los menores que nacen en estas familias— se encuentra desprovisto de legislación que atienda y defina adecuada-mente, de una forma u otra, cuáles son los derechos que le cobijan en el ordenamiento jurídico. Esa ausencia de legis-lación que atempere los avances en las tecnologías de re-producción humana y los vínculos que sobrevienen con ésta a nuestra realidad jurídica y social, crea inestabilidad y una arbitrariedad muy particular en materia de derecho de familia.(29)
*1089 Por lo tanto, este Tribunal tiene el deber de declarar y proteger los derechos de los menores que no se encuentran cobijados por el Art. 138, supra. Así lo exige el Art. 7 de nuestro Código Civil, el cual nos impide negar un remedio cuando el Derecho resulta silente, insuficiente u obscuro. 31 L.P.R.A. sec. 7. Más bien, ante los vacíos legislativos que afectan el mejor interés de estos menores productos de nuevos modelos neoparentales, nuestro ordenamiento nos ordena a valernos de la equidad para dar “lugar a excep-ciones y... atemperar la rigurosidad de las normas cuando, por sus términos absolutos, se produce una injusticia en una situación particular”. (Énfasis suplido). BPPR v. Sucn. Talavera, 174 D.P.R. 686, 694 (2008).
Nuestra labor no es dejar a estos niños y niñas a la deriva en un ordenamiento jurídico que se desarrolla a una velocidad significativamente menor que la sociedad. Tam-poco debemos buscar argumentos para dar por zanjada la cuestión hasta después de que la Asamblea Legislativa actúe. El problema es, precisamente, la falta de legislación. Pero ello no debe ser pretexto para pasar por el lado de la menor sin muestras de reparar en ella, mediante la aplica-ción automática de disposiciones del Código Civil que no fueron pensadas, creadas ni legisladas para regular este tipo de adopción.
En ocasiones, aplicar artículos del Código Civil que fue-ron instituidos para otras situaciones, a nuevas controver-sias producto de los avances científicos y cambios sociales, puede implicar resultados claramente desatinados. Tó-mese por ejemplo lo siguiente. Nuestro Código Civil no re-gula la donación de espermatozoides, el acuerdo contractual para ello, la reproducción asistida mediante terceros, ni los vínculos jurídicos así emergentes. Si aplicáramos disposiciones de nuestro Código —tal como lo ha hecho la opinión mayoritaria— que fueron concebidas para otras si-tuaciones, se podría llegar al absurdo de determinar que *1090 en una acción de filiación interpuesta posteriormente por la menor, el donante de espermatozoides es en efecto el padre de ésta y que jurídicamente en él reside su filiación, con todas las obligaciones del cargo —alimentos y herencia incluidos— aunque la realidad es que tal no es el caso. Aunque la verdad es que el donante no es su padre. Ello, pues pese a esta realidad, nuestro Código Civil de 1930, según enmendado, ignora la posibilidad de que este tipo de donación de células reproductivas pueda ocurrir, y da por sentada la existencia de un “padre biológico” o de una fa-milia anterior.
De igual forma, el Art. 138, supra, contempla y regula los efectos en los vínculos jurídicos cuando el menor pro-cede de una familia anterior, pero no cuando el menor ha nacido debido a la intención de dos personas —que han constituido su única familia— de traerle a la vida por me-dio de una inseminación intrauterina en la cual se contrató a un donante de espermatozoides para que proveyera el material genético empleado para la procreación. Al no cumplirse con el requisito de umbral de que el adoptado provenga de una familia anterior, por causa de que quien pretende adoptar a la menor proviene de su única familia —la de siempre— el ámbito de aplicabilidad del Art. 138, supra, no queda activado. Ante la inaplicabilidad del Art. 138, supra, nuestro ordenamiento guarda silencio respecto a cómo habremos de proveerle justicia a una menor que se beneficiará enormemente de una filiación adoptiva que mantenga vivos los vínculos jurídicos de la adoptada con su madre biológica, al igual que con su madre funcional, quien ahora pretende obtener un reconocimiento legal de esa verdad social.
Muy a pesar de la ausencia de legislación que regule la presente controversia, la opinión mayoritaria articula un supuesto impedimento legal para prohibir la adopción de JMAV. Sin embargo, ese impedimento legal no existe por-que es inaplicable el Art. 138, supra, a situaciones tácticas *1091 como la de marras. Ante la inaplicabilidad del estatuto con sus dos supuestos jurídicos, no encontramos disposición al-guna en nuestro Código Civil que impida que este Tribunal, amparado en el Art. 7 del Código Civil, supra, permita la adopción en el caso de marras.
Lo que sí se encuentra en el Código Civil es el principio fundamental de que para conceder una adopción lo verda-deramente importante es el bienestar del menor. También se encuentran los requisitos para que cualquier persona pueda adoptar, y según la evidencia AAR cumple con éstos. Véase el Art. 130 del Código Civil (31 L.P.R.A. sec. 531).(30) Asimismo, el Código dispone taxativamente quiénes no pueden adoptar, y lo prohíbe solamente a “las personas de-claradas incapaces por decreto judicial mientras dure la incapacidad” y a las personas sentenciadas a cumplir pena de reclusión, mientras dure ésta. Art. 131 del Código Civil (31 L.P.R.A. sec. 532). El Código no dispone que la orienta-ción sexual de una persona sea motivo de incapacidad para adoptar, por lo que no existe prohibición para que AAR adopte individualmente a la menor. Estas disposiciones aplicables a cualquier tipo de adopción son las que este Tribunal debió emplear, y no un artículo que ni siquiera fue pensado e instituido para regular esta controversia, y que desde su historial legislativo hasta su contenido y tí-tulo —“Subsistencia del vínculo con la familia anterior”— comunica que solo regula el supuesto de subsistencia de vínculos cuando el menor proviene de una familia previa.
Por lo tanto, en el ejercicio de nuestra discreción para resolver situaciones que no están reguladas específica-mente por el estatuto, y en vista de la política pública y del interés apremiante del Estado de velar por el bienestar de *1092 los menores, nada impide que se reconozca en nuestro or-denamiento jurídico la figura del Second Parent Adoption para brindarle protección jurídica a esos menores que no la tienen, por el mero hecho de formar parte de familias no tradicionales cuyos derechos aún no han sido definidos por el legislador. Conforme a ésta, la pareja consensual del padre o madre legal del niño o la niña puede adoptar al me-nor sin que se disuelvan los vínculos jurídicos existentes. Lo que siempre habrá que evaluar es si según la prueba esa adopción responde al mejor bienestar del menor.
El propósito principal de la figura del Second Parent Adoption es brindarle al menor los beneficios legales, eco-nómicos y psicosociales que gozan otros niños y niñas pro-creados en otras familias. La adopción en estos casos per-mite imponer al adoptante todas las responsabilidades asociadas a la crianza del menor, con el fin de proteger a la criatura. Por ejemplo, ese adoptante tiene el deber jurídico de proveerle al menor: alimentos, ropa, educación, un lu-gar donde vivir y cuidado médico, entre otros. Por el con-trario, de no concederse la adopción y de ocurrir una rup-tura en la relación de los adultos —tal como puede suceder en cualquier tipo de relación— la madre funcional de la menor que participó voluntariamente en la decisión de traerle al mundo, no tendría obligación jurídica alguna de proveerle pensión alimentaria a la niña. Con la adopción, esos menores tendrían los mismos derechos de alimentos que otros niños y niñas que pertenecen a familias tradi-cionales.
Del mismo modo, el Second Parent Adoption permite proveerle seguridad a los vínculos jurídicos en caso de muerte de uno de los padres o madres. La pérdida de un ser tan querido suele producir un profundo daño emocional y psicológico en el menor, que es aliviado por la presencia del padre o madre sobreviviente. El menor, por lo menos, ha de contar con la seguridad de que no será removido de su propio hogar ante la muerte de su madre o padre legal.
*1093 Además, y para la conveniencia del menor, esta figura admite garantizarle la herencia potencial de ambos padres o madres; los beneficios de seguro social a través de ambos padres o madres; permite su inclusión en los seguros de vida y seguros médicos de ambas madres o padres, lo que en este último caso le permite a la familia escoger la mejor de las dos pólizas y en caso de desempleo de su madre o padre legal, protege al menor de la pérdida entera de un plan médico, y le garantiza su seguridad emocional al te-ner una familia reconocida legalmente. En suma, al permi-tir la adopción se valida legalmente un núcleo familiar ya existente, con el propósito de asegurar la igualdad y pro-tección jurídica del menor.
Los menores no tienen participación en la decisión de nacer, ni en la familia en que nacen. No reconocer la con-veniencia de que estos menores tengan vínculos jurídicos estables con las personas que han decidido traerle al mundo, equivale a privarles de los derechos y beneficios que disfrutan otros niños y niñas que forman parte de otras familias. S. Bryant, Second Parent Adoption: A Model Brief, 2 Duke J. Gender L. & Pol’y 233, 234-239 (1995).
Incorporar la figura del Second Parent Adoption consti-tuye el remedio oportuno que habrá de impedir tal ocurrencia. Interpretar que el Art. 138 del Código Civil, supra, impide que subsistan los vínculos jurídicos de una menor con su madre biológica cuando es adoptada por la madre funcional que también la planificó, la ha sustentado y criado, es negarle a la menor el reconocimiento legal de su condición filial social real. Tal proceder representa una interpretación anacrónica de la institución filial y obvia que la menor y la madre funcional gozan de una relación filial de carácter social que merece protección legal.
Esta Curia ha permanecido inmóvil en su conceptualization de la filiación como una doctrina escindida en dos realidades: la biológica y la jurídica. Beníquez et al. v. Var *1094 gas et al., 184 D.P.R. 210, 226-227 (2012); Vázquez Vélez v. Caro Moreno, 182 D.P.R. 803 (2011); Castro v. Negron, 159 D.P.R. 568, 580 (2003). Por un lado, hemos aseverado que la realidad biológica caracteriza una filiación natural que adjudica a determinadas personas el haber provisto material genético para la procreación de un ser humano. Vázquez Vélez v. Caro Moreno, supra, pág. 809; Mayol v. Torres, 164 D.P.R. 517, 529-530 (2005). Por otra parte, nuestros pronunciamientos jurisprudenciales han decla-rado que la filiación jurídica distribuye derechos y obliga-ciones, vinculando a los padres con los hijos, sin necesaria-mente verse obligada a descansar en el hecho biológico para arribar a tal adjudicación. Sánchez v. Sánchez, 154 D.P.R. 645, 660-661 (2001). Al expresarnos sobre la rela-ción existente entre estas dos realidades de la institución filial, hemos sido prontos en enunciar que “[l]a filiación es una relación fundamentalmente jurídica, para la cual el derecho selecciona, con el fin de establecerla, varios crite-rios, de los cuales los básicos son los biológicos. Más sin embargo, tal realidad biológica no coincide siempre con la jurídica”. (Enfasis nuestro). Íd.
A pesar de que hemos reconocido que, en ciertas ocasio-nes, la realidad jurídica no siempre coincidirá con la reali-dad biológica, aún nuestro ordenamiento jurídico no ha vis-lumbrado y atendido una multiplicidad de contextos fácticos que inciden en la institución de la filiación como una compuesta por una realidad biológica, una realidad jurídica, o ambas. Como bien establecimos anteriormente, ante el avance de la tecnología y la emergencia de nuevos modelos neoparentales, es nuestro deber reconocer la exis-tencia de las herramientas necesarias para responder a las nuevas realidades sociológicas que han enmarcado novedo-sos métodos reproductivos y relaciones sociales que trotan a mayor velocidad que el paso evolutivo de nuestro ordena-miento filial. Véase A. Cadoret, Familias homoparentales: la clave del debate, en Barcelona Metropolis: Revista d’ in- *1095 formado i pensament urbans, Cuaderno Central, pág. 37 (2012).
La reproducción asistida, con sus múltiples matices, ha planteado desarrollos acelerados que exigen una reconcep-tualización de la interpretación del concepto filiadón. Es por ello que no debemos ignorar la vertiente de la institu-ción de la filiadón sodal, la cual recoge, precisamente, la realidad que vive la menor JMAV. La vertiente jurídica de la filiación social se caracteriza por reconocer un vínculo entre el menor y los adultos que lo crían, sustentan y velan por su bienestar; no en respuesta, meramente, a algún ele-mento biológico o jurídico, sino a base de que el padre o la madre funcional que participó en la decisión de concebir al menor mediante un proceso de reproducción asistida, le ha provisto al menor “un cuidado físico, psicológico, intelec-tual y espiritual” a lo largo de su desarrollo. (Traducción nuestra). L.N. Althouse, Three’s Company? How American Law Can Recognize a Third Social Parent in Same-Sex Headed Families, 19 Hastings Women’s L.J. 171, 173 (2008).
Concretamente, una filiación social existe cuando un adulto ejerce derechos o asume obligaciones en beneficio de un menor, independientemente de los vínculos legales o biológicos que puedan existir entre ambos. J. Shapiro, Creating Life? Examining the Legal, Ethical, and Medical Issues of Assisted Reproductive Technologies: A Lesbian Centered Critique of “Genetic Parenthood”, 9 J. Gender, Race & Just. 591, 593 (2006). Existe una filiación social entre un adulto y un menor cuando aquél está presente en la planificación del embarazo, cuida por la madre biológica durante la gestación, está presente durante el parto y pro-vee para las necesidades y el cuidado futuro del menor. N.E. Dowd, Parentage at Birth: Birthfathers and Social Fatherhood, 14 Wm. & Mary Bill Rts. J. 909, 927 (2006).
Al así actuar, la conducta manifestada por el adulto en pro de la menor genera una realidad social presenciada por *1096 la comunidad en la cual se desarrollan la madre funcional y la menor, creando así una situación fáctica innegable que exige una respuesta de nuestro ordenamiento jurídico. De tal manera, los vecinos de la familia, los maestros de la menor, las amistades de las madres y de la niña, y otros miembros del contexto social de la menor, sólo conocen una realidad: la menor posee dos madres, una biológica y una funcional. Shapiro, supra, págs. 600-601. Más importante aún: esa es la realidad que ha conocido, conoce y seguirá conociendo la menor.
¿Qué hacemos, entonces, cuando la filiación biológica y la jurídica no proveen un marco legal para socorrer a una niña producto de una reproducción asistida originada en la voluntad de dos personas, una madre biológica y otra fun-cional? ¿Qué hacemos cuando las definiciones del término filiación que hemos adoptado en nuestros precedentes nor-mativos no vislumbran el supuesto de hechos que hoy dis-cutimos, dejando en el desamparo a una familia compuesta por dos madres y una menor, la cual sólo exige un recono-cimiento jurídico de su verdadera realidad filial?
La respuesta debe redundar en el reconocimiento de la filiación social de la menor, cuando esa realidad es la que aporta a su mayor bienestar. Decidir lo contrario resultaría en ignorar que la institución de la filiación no se desdobla únicamente en una realidad biológica y otra jurídica, sino que tiene que reconocer un criterio de vital relevancia: la realidad social mediante la cual será padre o madre aquel o aquella que ante la sociedad esté dispuesto o dispuesta a proveerle al menor un cuidado físico, psicológico, intelec-tual y espiritual, a lo largo de su desarrollo, por causa de haber acordado con su progenitor participar en la decisión de traer a la vida al menor que ha ayudado a criar.
Ello es cónsono con nuestros pronunciamientos juris-prudenciales en los cuales hemos aseverado que la filia-ción, más allá del dato biológico, es una
... categoría... social que... integr[a] elementos afectivos, *1097 volitivos, sociales, formales, etc.; destacan en ella, además, unos roles importantes que la sociedad... confier[e] a los pro-tagonistas de dicha relación, donde lo funcional y el papel social tienen a veces mayor trascendencia que el elemento natural o biológico”. (Enfasis nuestro). Beníquez v. Vargas, supra, pág. 228.
Más aún, ello es cónsono con el criterio rector en mate-ria filial y adoptiva: el mejor bienestar del menor.
De otra parte, la figura del Second Parent Adoption ha sido empleada en la mayoría de las jurisdicciones de Esta-dos Unidos y en la comunidad internacional.(31) Es notable la cantidad de prestigiosas organizaciones profesionales en el área de la conducta humana y de la salud, que como política institucional apoyan este tipo de adopción. Entre éstas se encuentran: la American Psychological Association; American Psychiatric Association; American Academy of Pediatrics; American Academy of Child & Adolescent Psychiatry; American Academy of Family Physicians; American Medical Association; American Psychoanalytic Association; National Association of Social Workers; Child Welfare League of America; National Adoption Center; National Foster Parent Association, y North America Council on Adoptable Children.(32) Como ha de verse, las organizaciones con pericia, información de confiabilidad científica y el personal especializado en lograr el bienestar y la salud física, mental y social óptima para todo infante, *1098 niño o niña, adolescente y adulto joven, apoyan este tipo de adopción. Y es que, salvo que se siga el hilo de un secreto razonamiento, no hay evidencia que sostenga la conclusión de que las adopciones por personas de un mismo sexo afec-tan de forma negativa a los menores.
Como AAR cumple con todos los requisitos para ser adoptante de quien siempre ha sido su hija, y ésta no pro-viene de la “familia anterior” contemplada y supuesta por el Art. 138 del Código Civil, supra, lo que este Tribunal debió valorar es si en este caso la adopción responde al mejor bienestar y conveniencia de JMAV. La abundante prueba pericial e informes sociales y psicológicos admitidos en evidencia demuestran que la adopción responde al me-jor interés de la menor. Difícilmente puede encontrarse en los tribunales un caso en el cual la prueba sostenga de manera tan contundente que la adopción responde al mejor bienestar del menor. Hasta el propio Estado reconoce que “la prueba vertida en el récord de este caso no indica que [la] menor sufriría daño de concederse lo que se solicita; todo lo contrario, como asunto fáctico, la prueba demuestra que los intereses [de la] menor muy posiblemente serían servidos si se concediese el remedio solicitado por la ape-lante [AAR]”. Véase el Alegato de la parte apelada ante el Tribunal de Apelaciones, pág. 2, Apéndice, pág. 341.
La perita en psicología clínica y forense, Dra. Carol M. Romey, estableció que, para la menor, AAR juega un papel fundamental en el núcleo familiar, el cual siempre ha es-tado compuesto por dos madres. Por ese hecho la niña nunca se ha sentido rara.(33) Son una familia en toda inte-racción con las amistades, con el vecindario, en la escuela de JMAV, en los centros de empleo de cada cual y con la familia extendida. Del proceso de evaluación de la menor no surge riesgo alguno ni área de vulnerabilidad en el ho-gar en el que ha vivido desde el momento de su concepción *1099 y nacimiento.(34) Tampoco existe evidencia alguna de facto-res que puedan ser peijudiciales para el bienestar de la niña.(35) Y es que en este hogar la niña se ha desarrollado al máximo de sus potencialidades.
JMAV tiene un cociente de inteligencia global muy superior al de su grupo normativo. También se encuentra a un nivel muy superior en destrezas verbales, de ejecución, memoria remota, conocimiento general, habilidades para el razonamiento lógico y abstracto, razonamiento aritmé-tico, juicio social, control de la atención y concentración.(36) La menor goza de excelentes habilidades de asociación y análisis. Además, los patrones de comunicación que ha aprendido con AAR y CW son abiertos, sinceros e iguali-tarios, e incluyen la virtud del respeto hacia puntos de vista distintos.(37) La niña, pues, tiene una percepción ade-cuada de sí y de su entorno social, y un nivel de madurez más avanzado de lo esperado para su edad.
Nótese que a diferencia de las causas tradicionales de adopción que contempla el Art. 138 del Código Civil, supra, en las cuales se suele evaluar al adoptante según las cua-lidades desplegadas en otros entornos separados del me-nor, en este caso, con solo examinar el desarrollo de la niña desde su concepción y nacimiento hasta el presente, puede concluirse que la adopción por parte de AAR responde al mejor bienestar de JMAV. Y es que la menor nunca ha sido el resultado de una familia anterior.
La niña sobrevino a la vida producto de la voluntad con-junta de AAR y CW. Ellas han tenido una relación estable desde 1988 y decidieron que CW, por ser más joven que AAR, se sometería a un procedimiento de inseminación artificial. Ambas hicieron gestiones para contactar a un *1100 donante de espermatozoides en Estados Unidos, establecer el acuerdo de donación y conocer los datos del historial familiar y de salud del donante, con el entendido no des-prevenido de que esa información podría ser necesaria para la salud de la criatura en algún momento ulterior. AAR estuvo vinculada en todas las etapas del embarazo, desde cuidados prenatales hasta clases preparto. El día del alumbramiento, AAR estuvo junto a CW y desde entonces AAR, junto a CW, ha cuidado, educado y ofrecido un hogar estable y seguro a JMAV.
Difícilmente puede afirmarse que la menor proviene de una familia anterior a la de AAR y CW, y que con la adop-ción se le permitirá formar parte de una familia posterior que en esta ocasión le proveerá estabilidad y un nuevo ho-gar a la niña donde pueda desarrollarse como individuo. Véase Exposición de Motivos de la Ley Núm. 8-1995, supra. Esta ha sido la realidad de la menor desde siempre, y esta ha sido y será su familia.
Aquí hemos expuesto la inaplicabilidad de una norma que ha sido interpretada erróneamente y que intenta oscu-recer la realidad y filiación social de la menor JMAV. He-mos demostrado que existen las herramientas jurídicas ne-cesarias para conceder la adopción solicitada. Aun así, la mayoría de este Tribunal considera que el Art. 138, supra, aplica. Con ello, esa interpretación tiene como resultado negar jurídicamente la trascendencia que ha tenido en su vida la filiación social que ha disfrutado la menor; resulta insuficiente para garantizar los derechos de JMAV y silen-cia la realidad que exclama y grita felizmente a los cuatro vientos la menor.
En vez de interpretar innecesariamente la constitucio-nalidad de un artículo inaplicable, como AAR cumple con todos los requisitos para ser adoptante y no existe prohibi-ción estatutaria para que lo sea, según intimado, este Tribunal debió evaluar si en este caso la adopción responde al mejor bienestar y conveniencia de la menor. Tal es un fun- *1101 ¿Lamento válido en derecho y con amplio reconocimiento histórico en nuestra legislación de adopción que permite resolver el caso sin entrar en consideraciones constitu-cionales. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958). Ello, en conformidad con la norma de autolimitación judicial de “no [juzgar] la constitucionalidad de ley alguna, a menos que sea imprescindible para resolver el recurso ante nuestra consideración”. Asociación Maestros v. Comisión, 159 D.P.R. 81, 85 esc. 1 (2003). Cuando el legislador actúe y regule los vínculos jurídicos que sobrevienen cuando un menor nace debido a la voluntad de dos personas de traerle a la vida por medio de una inseminación artificial, en la cual se contrata a un donante de espermatozoides para que provea el material genético que se empleará para la pro-creación, entonces, y de ser necesario, estaremos en posi-ción de evaluar la constitucionalidad de esa disposición. Entretanto, el análisis constitucional de la opinión mayo-ritaria resulta innecesario y desatinado.
Aunque la presente controversia no está regulada espe-cíficamente por el estatuto, sí existe una sólida política pú-blica y un interés apremiante del Estado de velar por el bienestar de los menores, y el imperativo de interpretar las disposiciones sobre la adopción de forma liberal a favor del menor. Virella v. Proc. Esp. Reí. Fam., supra, pág. 756. También existen cambios en nuestra legislación con el ob-jetivo de liberalizar los requisitos y permitir que más me-nores puedan contar con la seguridad de tener uno o dos padres adoptivos. En ese tenor, y según la prueba, la ba-lanza debe inclinarse a favor de permitir la adopción de la menor, y no de prohibirla. El resultado es brindarle protec-ción jurídica a una niña cuyos derechos, por el mero hecho de nacer y pertenecer a una familia no tradicional, aún no han sido definidos por el legislador.
Por todo lo anterior, permitiría la adopción de la niña por parte de AAR sin que ello represente la ruptura del vínculo filial con CW. El fundamento es diáfano y sencillo: *1102 según la prueba, la adopción responde al mejor bienestar y conveniencia de la menor. En ella, ha de quedar fija la mirada. En ella.

 Utilizamos las siglas de los nombres de la peticionaria y de su pareja, ya que el 7 de julio de 2005, ésta presentó una moción al tribunal para permitir el uso de seudónimos y una petición para que el tribunal acoja y mantenga sellada la moción de seudónimos, toda vez que interesaba mantener la confidencialidad del procedimiento. A esos efectos, mediante orden de 5 de agosto de 2005, el Tribunal de Primera Instancia declaró el caso como uno que gozaba de “total confidencia”. Véase Apéndice, págs. 98-99 y 103.

 Véase Evaluación Social, Dra. Carmen Delia Sánchez, pág. 3, Apéndice, pág. 246.

 Íd.

 Íd., pág. 4, Apéndice, pág. 247.

 Véase Informe de Evaluación Psicosocial del Núcleo Familiar, Dra. Carol M. Romey (Psicóloga Clínica), 19 de febrero de 2007, pág. 22, Apéndice, pág. 202.

 Íd., pág. 23, Apéndice, pág. 203.

 Véase Evaluación Social, Dra. Carmen Delia Sánchez, pág. 5, Apéndice, pág. 248.

 Íd., pág. 4, Apéndice, pág. 247.

 Íd.

 Íd., pág. 5, Apéndice, pág. 248.

 Véase Evaluación Psicométrica, Dra. Sylvia Martínez (Psicóloga Clínica), 3 de agosto de 2006, págs. 2-3, Apéndice, págs. 172-173.

 Íd., pág. 3, Apéndice, pág. 173.

 Íd.

 Íd., pág. 4, Apéndice, pág. 174.

 Véase Informe de Evaluación Psicosocial del Núcleo Familiar, supra, pág. 18, Apéndice, pág. 199.

 Íd.

 Íd., pág. 25, Apéndice, pág. 205.

 Íd., págs. 24-25, Apéndice, págs. 204-205.

 Véase Evaluación Social, Dra. Carmen Delia Sánchez, pág. 6, Apéndice, pág. 249.

 Íd.

 Sentencia del Tribunal de Primera Instancia de 20 de junio de 2007, Apén-dice págs. 31-32.

 Esta ley se conoce como la Ley de Procedimientos Administrativos Expeditos para el Bienestar de la Niñez. Art. 1 de la Ley Núm. 248-2012.

 Al igual que la Ley Núm. 186-2009, el Art. 3 de la Ley Núm. 248-2012 reitera como política pública en materia de adopción facilitar en la forma más liberal y amplia posible los procedimientos de adopción y, además, simplificar y liberalizar sustancialmente los requisitos de ley para la emisión de decretos de adopción.

 Definición provista por la Real Academia Española, disponible en http:// lema.rae.es/drae/.

 Íd.

 La Exposición de Motivos de la Ley Núm. 9-1995 (1995 (Parte 1) Leyes de Puerto Rico 60) afianza lo anterior y va más allá en cuanto a claridad se refiere, al manifestar que la medida se aprobó “para enfrentar el grave problema social de niños desamparados” “en estado de abandono” y “maltrato”. Similar propósito guar- *1085 daban la Ley Núm. 85 de 15 de junio de 1953 (1953 Leyes de Puerto Rico 299) y la Ley Núm. 86 de 15 de junio de 1953 (31 L.P.R.A. ant. sec. 531 et seq.) —dar padres a niños que no los tuviesen o cuyos padres no los quisiesen— las cuales preceden a la Ley Núm. 8-1995, supra, y a la Ley Núm. 9-1995, supra.

 Véase, además, Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil de Puerto Rico, Borrador para discusión del Código Civil de Puerto Rico, Libro Segundo, Las Instituciones Familiares, Memorial Explicativo, T. II, 11 de enero de 2007, San Juan, Puerto Rico.

 Esta ley fue enmendada posteriormente por la Ley Núm. 327-2000 (2 L.P.R.A. sec. 141 et seq.).

 L. Sánchez de Brasero, Determinación filial basada en el bienestar del me-nor ante vínculos genéticos, gestacionales e intencionales, 41 Rev. Jur. UIPR 499 (2006).

 gn ]0 pertinente, este artículo requiere que el adoptante haya residido inin-terrumpidamente en Puerto Rico durante seis meses anteriores a la fecha de petición de adopción; que sea mayor de edad, salvo que dos personas unidas en matrimonio adopten conjuntamente, en cuyo caso uno de los adoptantes debe tener por lo menos dieciocho años de edad; tener capacidad jurídica para actuar; tener catorce años más que el adoptado menor de edad.

 Entre éstas: California, Colorado, Connecticut, Vermont, Distrito de Columbia, Illinois, Indiana, Massachusetts, New York, New Jersey, Pennsylvania, Alabama, Alaska, Delaware, Hawaii, Iowa, Lousiana, Maryland, Michigan, Minnesota, Nevada, New Mexico, Oregon, Rhode Island, Texas y Washington. Disponible en http://www.proudparenting.com/node/949?page=l (última visita el 1 de octubre de 2012). En la comunidad internacional múltiples países permiten la adopción por parejas del mismo sexo, entre éstos: el Reino Unido, Alemania, España, Uruguay, Suecia, Islandia, Dinamarca y Noruega. A.K. Wooster, Adoption of Child by Same-Sex Partners, 61 A.L.R. 6th 1 (2011).

 http://www.nclrights.org/site/DocServer/Adoption_Policy_Statements_ 200609.pdf?docID=1881 (última visita el 1 de octubre de 2012). El Capítulo de Puerto Rico de la American Academy of Pediatrics y el Departamento de Pediatría de la Escuela de Medicina de la Universidad de Puerto Rico comparecieron ante nos como amicii curiae y también se expresaron a favor de la adopción por personas del mismo sexo.

 Véase la Evaluación Social, supra, pág. 4, Apéndice, pág. 247.

 Véase Informe de Evaluación Psicosocial del Núcleo Familiar, supra, pág. 25, Apéndice, pág. 205.

 Véase Evaluación Social, supra, pág. 6, Apéndice, pág. 249.

 Véase Evaluación Psicométrica, supra, pág. 3, Apéndice, pág. 173.

 Véase Evaluación Social, supra, pág. 5, Apéndice, pág. 248.